**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DELOVI CANALES, et al.,

    Plaintiffs,

    v.

TOWNSHIP OF TOMS RIVER, et al.,

    Defendants.

CIVIL ACTION NO. 11-3159 (MLC)

**MEMORANDUM OPINION**

**COOPER, District Judge**

    Before the Court are two separate motions for summary judgment by two groups of defendants in this matter: (1) the Township of Toms River, the Township of Toms River Police Department, Scott Kenny, Pat Jacques, Ed Mooney, Jim Carey, Chris McDowell, P.J. Gambardella, and Kevin Scully (hereinafter "Township Defendants") (dkt. entry no. 43); and (2) the New Jersey State Police (hereinafter "State Police") (dkt. entry no. 46).  The motion by the State Police will be granted.  The separate motion by the Township Defendants will be granted in part and denied in part without prejudice.

## I.   FACTUAL BACKGROUND

    According to the undisputed facts, Officer Christopher Matlosz of the Lakewood Police Department was killed in the line of duty on January 14, 2011.  (See dkt. entry no. 41, Am. Compl. at ¶ 15; dkt.

entry no. 43-2, Monaco Certif., Ex. C, Investigation Narrative.)  A search began for the perpetrator by various law enforcement agencies.  Law enforcement obtained information that the suspect was lodged at the Howard Johnson's Hotel (hereinafter "Hotel") in Toms River, New Jersey with a high-ranking gang member.  (Dkt. entry no. 48-3, Stanzione Decl., Ex. C, Leskowski Dep. at 11-12; Investigation Narrative.)  Law enforcement's concern was that "nobody else leaving the hotel would be transporting that suspect out of the hotel."  (Leskowski Dep. at 12.)

A sub-station and a command post for law enforcement were set up near the Hotel.  (Investigation Narrative; dkt. entry no. 48-2, Stanzione Decl., Ex. B, Henry Dep. at 6-8.)  Officers from numerous law enforcement agencies -- including Brick Township, Toms River, Lakewood, and the State Police, among others -- gathered at the sub-station and command post.  (Investigation Narrative; dkt. entry no. 48-5, Stanzione Decl., Ex. E, Kenny Dep. at 40-41.)  The officers from the various agencies, including the State Police, were dressed in a variety of uniforms and tactical gear, as well as in plain clothes.  (Henry Dep. at 9, 20-21; Leskowski Dep. at 26-28; Kenny Dep. at 41-42.)

Captain Henry (hereinafter "Capt. Henry") of the Toms River Police Department testified that he recalled interacting with multiple officers from the State Police at the sub-station and

2

command post, but he did not know the majority of their names.
(Henry Dep. at 6-9.)  Capt. Henry testified that, to his knowledge,
there was no roster or sign-in for the various officers from
different agencies who were assisting in the operation.  (Id. at
25-26.)

That same evening, January 14, 2011, and into the early hours
of the morning on January 15, 2011, Delovi Canales, Alex Valcourt,
and Terrance Williams (collectively "Plaintiffs") went to
Christopher's Pub (hereinafter "Pub"), which is part of the Hotel
in Toms River.  (Dkt. entry no. 48-1, Stanzione Decl., Ex. A,
Canales Dep. at 11-13; dkt. entry no. 48-6, Stanzione Decl., Ex. F,
Valcourt Dep. at 10-13; dkt. entry no. 48-8, Stanzione Decl., Ex.
H, Williams Dep. at 17.)  On their way home from the Pub,
Plaintiffs were stopped by law enforcement at two different
locations.  These stops are the basis of the Plaintiffs' claims
here.

**A.   The Canales/Valcourt Stop**

**1.   Plaintiffs' Version of Events**

Delovi Canales (hereinafter "Canales") and Alex Valcourt
(hereinafter "Valcourt") left the Pub together around 1:00 A.M. on
January 15, 2011.  Canales was driving a 2007 Cadillac CTS, and
both were headed towards the home of Canales, which was
approximately seven to twelve minutes away.  (Canales Dep. at 15;

Valcourt Dep. at 14-16; Am. Compl. at ¶ 16.)  As they drove, they noticed a bright spotlight behind them.  (Canales Dep. at 16-17; Valcourt Dep. at 17.)  Canales eventually pulled over because the spotlight was so bright that he could not see.  (Canales Dep. at 17.)  The vehicle with the spotlight also pulled over behind them. Canales and Valcourt testified that there were no police sirens, no overhead police lights, no "PA system," nor anything else that would have alerted them that the spotlight belonged to any type of law enforcement.  (Id.; Valcourt Dep. at 17-18.)

Canales stuck his head out of the driver side window and looked behind him.  (Canales Dep. at 18.)  He noticed figures coming toward them that he identified as law enforcement officers, although the officers did not show him a badge or identify themselves.  (Id. at 18-19.)  Valcourt testified that he also saw the figures approaching with flashlights, but at that time he did not know that they were law enforcement.  (Valcourt Dep. at 18.) Valcourt stated that someone approached the passenger side of the car, so he rolled down the window, and the individual pointed a gun in his face.  (Id. at 18.)

Canales and Valcourt differ somewhat in terms of the order of what was said by whom next.  Canales testified that he asked the officer who had approached the driver side of the car, "What's going on[?]"  (Canales Dep. at 18-19.)  Canales then heard a voice

on the passenger side of the car (where Valcourt was sitting) that stated, "Snatch the one, get the one in the driver's seat first, since he has all the mouth."  (Id. at 19-20.)  Valcourt testified that as soon as the individual pointed a gun in his face, and before Canales said anything, the person said "Put your hands on the dashboard and if you move I will [f***ing] kill you." (Valcourt Dep. at 19.)  By this point, Valcourt believed that the individuals who had approached the vehicle were law enforcement because they were wearing tactical gear and the officer was wearing a face mask, but he testified that they did not identify themselves as law enforcement.  (Id. at 20.)  According to Valcourt, Canales then asked the officer what was going on, and the officer said, "Hey, get the driver, get the one with the mouth."  (Id. at 19.)

Canales and Valcourt both testified that the officer on the driver side then pulled Canales from his car, slammed him into the ground, and placed a knee in his face.  (Id. at 20-22; Canales Dep. at 20.)  The officer who pulled Canales from the car was in plain clothes and was not wearing tactical gear.  (Canales Dep. at 21; Valcourt Dep. at 21.)  This plain-clothes officer did not identify himself as a police officer at any point.  (Canales Dep. at 29-30.) Valcourt, who had been at several other depositions in this case, testified that he was "pretty sure" that it was Defendant Sgt. Scott Kenny (hereinafter "Sgt. Kenny") of the Toms River Police

Department who pulled Canales out of the car.  (Valcourt Dep. at 21.)  At Valcourt's deposition, defense counsel informed Valcourt that Sgt. Kenny had testified that he was wearing tactical gear on the night in question.  (Id.)  Valcourt responded, "No, he was not in S.W.A.T. gear."  (Id.)  Canales, who had not been at all of the other depositions in this case, testified that he did not know who the officer was.  (Canales Dep. at 20.)

According to Canales, the officer then said "Don't [f***ing] move or I'll blow your head off."  (Id.)  At the same time, another officer, who was dressed in a tactical uniform, had a large gun directed at him.  (Id. at 20-21.)  The plain-clothes officer then placed metal handcuffs on Canales, and Canales remained on the ground for approximately eleven minutes.  (Id. at 22, 28.)

Canales testified that when the officer allowed him off the ground, rather than directing him to get up, the plain-clothes officer lifted him off the ground by his handcuffs.  (Id. at 23.)  Then Canales was slammed down onto the hood of the unmarked police car, which was behind his car, where he remained for approximately eleven minutes.  (Id. at 24, 28; see also Valcourt Dep. at 30-31.)

After Canales was brought onto the hood of the unmarked police car, Valcourt was pulled out of the car by who he believed was the same plain-clothes officer.  (Valcourt Dep. at 24-25.)  According to Valcourt, the officer put him on the ground and handcuffed him.

6

(Id. at 24-25.)  The officer then picked him up off the ground, and Valcourt asked what was going on.  (Id. at 25-26.)  The plain-clothes officer did not respond, but the officer who had pointed a gun at him responded "Don't you know what happened today."  (Id. at 26.)  Valcourt responded that he had heard that an officer was shot that day.  (Id. at 27.)  Valcourt testified that, while he did not know it at the time of the incident, he believed based on deposition testimony that the officer who had pointed the gun at him for the duration of the stop was Defendant Officer Pat Jacques (hereinafter "Jacques") of the Toms River Police Department.  (Id. at 26-27.)  Valcourt explained that he was then also taken to the front of the unmarked police car.  (Id. at 27.)

Canales and Valcourt testified that, after being brought behind Canales's car to the front of the unmarked police car, the law enforcement officers searched their pockets and obtained their identifications.  Specifically, Canales testified that the plain-clothes officer performed the search, while Valcourt testified that "somebody" searched him.  (Id. at 29; Canales Dep. at 25.)  While this was occurring, Canales and Valcourt were asked where they were coming from, what they were doing there, and whether Canales had been drinking.  (Canales Dep. at 25-26; Valcourt Dep. at 29.)  One of the men asking questions identified himself as being a member of the Federal Bureau of Investigation (hereinafter "FBI").  (Canales

Dep. at 26; Valcourt Dep. at 29.)  According to Valcourt, after this conversation, the officers in tactical gear proceeded to search Canales's car.  (Valcourt Dep. at 30.)

Canales testified that, around this point, he was allowed to stand upright.  (Canales Dep. at 27.)  He asked the plain-clothes officer to remove his handcuffs.  (Id.)  The plain-clothes officer removed the handcuffs and instructed him to place his hands on the top of his head.  (Id.)  Canales explained that, at this point, the plain-clothes officer's aggressiveness had subsided.  (Id. at 27-28.)  Valcourt's handcuffs were also removed.  (Valcourt Dep. at 35.)  The officers returned the identifications to Canales and Valcourt and allowed Canales to remove his hands from his head.  (Id.; Canales Dep. at 28-29.)  Canales and Valcourt were then allowed to leave the scene and proceed to Canales's home.  (Canales Dep. at 30; Valcourt Dep. at 37-38.)

Canales estimated that the entire incident lasted thirty-five to forty minutes.  (Canales Dep. at 30.)  Valcourt estimated that it lasted about twenty-five minutes to a half hour.  (Valcourt Dep. at 32.)

As to which law enforcement agencies were present at the scene, Canales testified that he was "pretty sure" he saw a Toms River police car at the scene.  (Canales Dep. at 29.)  However, Valcourt testified that he did not recall seeing any marked Toms

River vehicles and that no officers identified themselves as Toms
River Police.  (Valcourt Dep. at 32-33.)  When asked whether there
was anything that indicated that the State Police were at the
scene, both Canales and Valcourt replied in the negative.  (Id. at
33; Canales Dep. at 29.)

The day after the incident, Canales went to the Toms River
Police Department to file a complaint regarding the stop, but the
desk sergeant told him that there was no record of that stop having
been made.  (Canales Dep. at 50.)  Valcourt was not with Canales
when Canales went to file the complaint.  (Valcourt Dep. at 40.)

Valcourt suffered a bruised right knee following the incident,
but he did not seek treatment.  (Id. at 37.)  Canales testified to
more substantial physical injuries following the incident.  He
testified that the plain-clothes officer's act of lifting him up by
his handcuffs with his hands cuffed behind his back caused injury
to his left shoulder.  (Canales Dep. at 31.)  Upon returning home,
Canales went to the emergency room and later sought care from a
physician, Dr. Lombardi.  (Id. at 32-36.)  The emergency room
doctors and Dr. Lombardi both independently concluded from X-rays
and an MRI that Canales's clavicle was injured.  (Id. at 33-36.)
According to Canales, Dr. Lombardi told him that he could have
surgery or let it heal over time, and he opted to let his shoulder
heal over time because he could not be out of work following a

surgery.  (Id.)  Canales testified that he can no longer work out because he cannot lift weights at the gym.  (Id. at 40, 43-44.)  He stated that daily activities, such as putting on a coat, cause him pain.  (Id. at 43-44.)

At the time of the incident, Canales was employed as a "packer," a position that was physical in nature, and the injury to his shoulder interfered with his ability to work.  (Id. at 8, 43.)  Canales testified that, as a result of the incident and his psychological and physical injuries, he was out of work for two to three months and lost $3,000 to $4,000 in compensation.  (Id. at 42-43.)  He subsequently took another position at the same company that did not require him to lift over five pounds.  (Id. at 44.)

Canales also saw a psychologist following the January 15, 2011 incident.  (Id. at 37.)  Canales testified that his previously-diagnosed anxiety increased following this incident.  (Id. at 38, 46.)  The increased anxiety has led to bad dreams and problems with focusing on simple tasks.  (Id. at 46-47.)  He was prescribed Alazopram for his anxiety.  (Id. at 47.)

Valcourt testified that he too had suffered psychological injuries from the trauma of the incident, but, as of the time of his deposition, he had not sought treatment, although he was considering it.  (Valcourt Dep. at 41.)  For some time after the

10

incident, Valcourt suffered from nightmares and cold sweats while sleeping.  (Id. at 42.)

### 2.  Law Enforcement's Version

Jacques and his superior officer Sgt. Kenny of the Toms River Police Department initiated the Canales/Valcourt stop on January 15, 2011.  (Dkt. entry 48-4, Stanzione Decl., Ex. D, Jacques Dep. at 7-8; Kenny Dep. at 7-8.)  Sgt. Kenny and Jacques did not recall who or which agency ordered that they stop the particular vehicle, but they believed that the order came from the command post. (Jacques Dep. at 7; Kenny Dep. at 7, 43.)  When asked whether he knew the reason for that particular stop, Sgt. Kenny testified that all he recalled was that the command post was not "sure if the occupants were some how linked to the investigation that was going on in Lakewood dealing with the Officer Matlosz shooting."  (Kenny Dep. at 9.)  Capt. Henry of the Toms River Police Department testified that the purpose of the Canales/Valcourt stop was that "the individuals matched a possible description of the suspected shooter."  (Henry Dep. at 19.)

Sgt. Kenny recalled that the command post had informed them that backup would be arriving at the stop to provide assistance. (Kenny Dep. at 45.)  Sgt. Kenny was driving a marked police car, which had either Toms River or Dover written on it, and Jacques was a passenger.  (Id. at 8-9; Jacques Dep. at 7-8.)  Jacques and Sgt.

11

Kenny testified that they were both wearing tactical uniforms. (Jacques Dep. at 8; Kenny Dep. at 10-12.)

When the stop was initiated, only Jacques and Sgt. Kenny were present.  (Jacques Dep. at 9.)  Sgt. Kenny testified that there was an initial delay in the stop because he was not familiar with the layout of the new emergency lights and siren system in the vehicle he was driving and because he was wearing bulky tactical equipment that made it more difficult for him to activate this new system. (Kenny Dep. at 10-11.)  Sgt. Kenny believed that he was ultimately able to activate the lights, but he was not sure if he activated the siren.  (Id. at 11.)  Sgt. Kenny testified that Canales and Valcourt pulled over within a few seconds after he activated the emergency light system.  (Id. at 12.)

Jacques testified that he exited the marked police car and approached Canales's vehicle with his gun drawn.  (Jacques Dep. at 10.)  He ordered, "Police.  Show me your hands."  (Id. at 10.) Jacques stated that Canales and Valcourt complied with this request.  (Id. at 11.)

Sgt. Kenny, on the other hand, testified that Canales was not compliant with the orders.  According to Sgt. Kenny, after the stop was initiated, they performed a "rapid take down" because they were unsure of the reason that they were ordered to make the stop in the first place.  (Kenny Dep. at 13.)  He testified that he and Jacques

exited their vehicle, "ran up to the vehicle, basically drew down on the two occupants in the vehicle and gave them verbal commands to remain there until we did have backup officers to assist us." (Id.)  Jacques approached the passenger side, and Sgt. Kenny approached the driver side.  (Id. at 14)  Sgt. Kenny stated that he identified himself and that "police" was written across their tactical vests.  (Id.)  Sgt. Kenny testified that he ordered the occupants to place their hands on the dashboard, but only the passenger complied.  (Id.)  The driver (Canales) did not comply and appeared agitated and defiant.  (Id.)   Canales kept his hands out of sight on his lap as opposed to placing them on the dashboard. (Id. at 14-15.)

Shortly after Jacques and Sgt. Kenny initiated the stop, two plain-clothes officers arrived in an unmarked car.  (Id. at 12, 15; Jacques Dep. at 11, 14.)  Sgt. Kenny did not recall emergency lights or sirens as the unmarked car approached.  (Kenny Dep. at 27.)  The plain-clothes officers were not Toms River Police Officers.  (Id. at 13; Jacques Dep. at 8-9.)  In fact, Capt. Henry testified that the Toms River Police Department did not have any plain-clothes officers involved in the stops on the night in question.  (Henry Dep. at 15.)  Jacques and Kenny described the plain-clothes officers as tall, muscular white males.  (Jacques Dep. at 14; Kenny Dep. at 19.)

13

Jacques and Sgt. Kenny did not recognize the plain-clothes officers, and the officers were not wearing any identifiers. (Jacques Dep. at 14; Kenny Dep. at 15, 20.)  When asked how they knew that the plain-clothes men were in fact officers, Sgt. Kenny replied, "To be honest with you I can only assume that they were from another agency and were backing us up."  (Kenny Dep. at 16.) He testified that they were working with several other agencies that night, including the Ocean County Prosecutor's Office and the State Police, and that he assumed the two officers in question were New Jersey State Police officers.  (Id. at 16-17.)  Jacques similarly testified that he knew they were police officers because he knew they were working with the Toms River Police Department that night.  (Jacques Dep. at 14.)  Notably, the Toms River Police Department's call information log from the night in question contains entries at 12:47 A.M. referencing the stop of the Cadillac and informing Sgt. Kenny, "njsp PLAIN CLOTHES BACKING YOU UP." (Dkt. entry no. 48-7, Stanzione Decl., Ex. G, Toms River Police Dep't Incident # 11-2275, at 11.)[1]

_____

[1] The entry does not reference Sgt. Kenny by name and instead says, "TO 208."  (Toms River Police Dep't Incident # 11-2275, at 11.)  Jacques testified that badge number 208 is Sgt. Kenny. (Jacques Dep. at 26.)  Capt. Henry testified that he may have been the person who sent that transmission.  (Henry Dep. at 17, 24-25.) He explained that he wanted to alert his men that the unknown individuals were "friendly" because many law enforcement agencies were involved, and his officers did not know all of the officers from these other agencies.  (Id. at 17.)

Jacques testified that he observed one of the plain-clothes officers remove the passenger (Valcourt) from the vehicle and walk him to the rear of the car. (Jacques Dep. at 16.) Jacques believed that the driver was also pulled out of the vehicle, but he did not witness it because he was watching the passenger. (Id.)

Sgt. Kenny similarly testified that both occupants were removed from the vehicle by the plain-clothes officers, placed on the ground, and handcuffed. (Kenny Dep. at 20-21.) Sgt. Kenny explained that he did not "have a good observation of what happened on the passenger side of the vehicle" based on where he was standing. (Id. at 21.) He stated, "my attention was at best keeping the scene safe, watching to make sure the officer that was doing the handcuffing did not need assistance, but also trying to monitor traffic so it didn't roll up and hit any of us while all this was going on." (Id.) Despite this, he denied that the driver was slammed to the ground. (Id. at 20.) He also did not remember the driver being lifted up by his handcuffs. (Id. at 21-22.) He did, however, recall that he advised the other officer to get out of the middle of the street because they were in a dark area, and Canales "was picked up and we did get him out of the middle of the road." (Id. at 21-22.) Sgt. Kenny did not "remember any man handling." (Id. at 22.) Canales was taken to the front of the vehicle where there was more light. (Id.) Additionally, the two

15

plain-clothes officers obtained the occupants' identifications, and Sgt. Kenny recalled speaking to dispatchers about the identifications.  (Id. at 23.)

According to Sgt. Kenny, throughout the stop, he and Jacques acted as "cover officers," who focused primarily on security and safety, and the plain-clothes officers acted as "contact officers," who performed the investigation.  (Id. at 25-26.)  The primary reason that Sgt. Kenny and Jacques acted as cover officers instead of contact officers was that they were wearing tactical gear and had rifles.  (Id. at 26.)

Jacques testified that the stop lasted less than ten minutes and that Canales and Valcourt were cooperative during the stop. (Jacques Dep. at 21-22.)  Sgt. Kenny estimated it was approximately fifteen minutes from the time of the stop until the time the occupants were released.  (Kenny Dep. at 24.)

Jacques and Sgt. Kenny testified that, to their recollections, there were a total of six officers at the stop at most:  Jacques and Sgt. Kenny; the two plain-clothes officers; and the FBI detectives Joseph Leskowski (hereinafter "Det. Leskowski") and Defendant Kevin Scully (hereinafter "Det. Scully").  (See id. at 28-29, 37; Jacques Dep. at 21-22.)  According to Jacques, he and Sgt. Kenny were the only officers at the stop wearing tactical uniforms.  (Jacques Dep. at 8.)

Neither Jacques nor Sgt. Kenny knew whether the plain-clothes officers searched the vehicle.  (Id. at 23; Kenny Dep. at 23-24.) Sgt. Kenny testified that once he was speaking on the radio with dispatch, he "wasn't really paying attention who did a search of the vehicle or if one was done."  (Kenny Dep. at 23.)  However, he stated that he performed a cursory search of the outside of the vehicle to see if there were any other people or weapons.  (Id. at 23-24.)

Det. Leskowski and Det. Scully were also present for part of the Canales/Valcourt stop.  Both had been assigned to and were reporting to the FBI's Safe Streets Task Force on the night in question.  (Leskowski Dep. at 5-6, 10-11.)  Their purpose in going to the stops was that, as part of the task force, they had special expertise, knowledge, and ability to identify persons associated with the target of the task force's investigation, "the Blood gang."  (Id. at 11, 23-25.)  Det. Leskowski testified that he and Det. Scully were not making vehicle stops that evening but that they had responded to the locations of the stops after the stops had already been made.  (Id. at 12, 21.)  In particular, three stops had been made that night, and Dets. Leskowski and Scully responded to two of those stops.  (Id. at 13, 21.)  All the individuals involved in the stops had been at the Hotel, or, more specifically, the Pub.  (Id. at 13-14.)  By the time the FBI

17

detectives arrived at the stops, the scene was secure, the detainees were identified, and the other officers on the scene were simply running their names for warrants.  (Id. at 13.)  Det. Leskowski testified that he and Det. Scully also asked some basic questions to the detainees, including whether they knew what had happened that night and what they had seen.  (Id. at 13-14.)

Det. Leskowski testified that, other than himself and Det. Scully, he did not believe anyone else at the Canales/Valcourt stop was in plain clothes.  (Id. at 16.)  He believed, but was not positive, that there were State Police officers at the Canales/Valcourt stop.  (Id. at 15.)  He stated most people were in tactical gear and therefore everyone pretty much looked the same. (Id.)  He believed that the State Police at the stop had been at the command post earlier in the evening, but he could not recall their names.  (Id. at 16-18.)

Det. Leskowski testified that when he arrived at the Canales/Valcourt stop, the two occupants were seated to the right back of the vehicle on the curb.  (Id. at 22.)  He spoke with one of the individuals, who he believed was the driver.  (Id. at 22-23.)  Det. Leskowski did not recognize the driver, and therefore, he only asked generic questions regarding the target of the evening's investigation.  (Id. at 23-24.)  According to Det. Leskowski, the driver did not understand what was happening and

18

wanted to get home because he had to work in the morning.  (Id. at 23.)  Det. Leskowski estimated that he was at the Canales/Valcourt stop for "less than 30 seconds."  (Id. at 20.)

Det. Scully testified that he was not sure whether, other than Sgt. Kenny and Jacques, the other individuals on the scene were actually officers.  (Monaco Certif., Ex. M, Scully Dep. at 9.)  He did not recall what anyone was wearing at the scene, and he did not know the reason for the stop.  (Id. at 9-10.)  He testified that he was there to identify the occupants at the stop and that he did not recognize them so they left.  (Id. at 10, 21.)  Det. Scully believed the occupants were pleasant and cooperative during the interaction.  (Id. at 21.)

**B.   The Williams Stop**

**1.   Williams's Version**

Terrance Williams (hereinafter "Williams") left the Pub at approximately 1:30 A.M. on January 15, 2011.  (Williams Dep. at 17.)  He was driving a gray Ford Explorer with a New York license plate that was registered to his grandmother.  (Id.)  On his way home, he pulled into a McDonald's drive-through, and he noticed police vehicles behind him.  (Id. at 19-20.)  Williams testified that some of the vehicles belonged to Dover Township and some to Toms River Township.  (Id. at 20.)  After he got his food, he was directed by the police into a parking spot.  (Id.)

19

The police ordered him to drop his keys to the ground outside of the car.  (Id. at 22.)  Williams testified that an officer then opened the driver side door, grabbed him by his shoulder, and pulled him out of the car.  (Id.)  The officer brought him to the back of his car, instructed him to spread his legs, and searched him.  (Id.)  Williams testified that the officer "pulled [him] with a little force to the back of the car" and that "[i]t was more than enough force."  (Id. at 22-23.)  The officer and his partner were wearing tactical gear and had guns pointed at him.  (Id. at 23.) After the officer searched him, the officer searched Williams's car extensively while the officer's partner kept the gun pointed at him.  (Id. at 23-24.)

According to Williams, the search lasted five to seven minutes, at which point the officer and Williams had an exchange. (Id. at 24.)  The officer said, "Come on.  I am going to walk you over to the back of my car."  (Id.)  Williams asked, "Am I being arrested for something?"  (Id.)  The officer replied, "Come over to the car and I will talk to you."  (Id.)  Williams testified that he acceded to the officer's request.  He got into the back of a Toms River police car, and the officer closed the door.  (Id. at 25.) At this point, "all of the other officers got out of the vehicle." (Id.)

Another officer in plain clothes then opened the car door to speak to him, and the plain-clothes officer's partner, who was also in plain clothes, was nearby.  (Id. at 26.)  Williams testified that these plain-clothes officers looked at him and shook their heads as if they did not know him.  (Id. at 25-26.)  The plain-clothes officer asked Williams if he knew why the officers had stopped him, and Williams responded that he did not.  (Id. at 26.)  Williams testified that the plain-clothes officer asked him if he knew someone named "Itchy" or "Eachy" and showed him a picture on a cell phone.  (Id.)  Williams stated that he had never seen him before.  (Id.)  The plain-clothes officer then closed the door.  (Id.)

The officer that had originally pulled him out of the car and given him direction came over to him and informed him that there was a murder.  (Id.)  Williams responded that he did not know anything about that.  (Id.)  Williams testified that the officer replied "not a problem, not a problem.  Just give us a few minutes, let us run your name to make sure you don't have no warrants and I'll let you go."  (Id. at 26-27.)  Williams asked the officer why his name was being run if he was not the person in question, and the officer replied that it was "protocol."  (Id. at 27.)

The two plain-clothes officers on the scene left at this point, but the two officers in tactical gear remained as did a

Dover Township officer in "regular clothes."  (Id. at 29-30.)
Williams testified that the officer who had originally taken him
out of his car allowed him to exit the police car and return to his
car to eat his food; however, the officers wanted Williams to stay
while they checked his identification.  (Id. at 29-30.)  Williams
was eventually permitted to leave, and he testified that the entire
incident lasted twenty minutes.  (Id. at 33.)

    Williams testified that he was not physically injured from the
incident but that he suffered mental injury.  (Id. at 33.)  He
described the incident as degrading and said that the officers did
not "have to take [his] manhood from [him] in order to locate what
[they were] looking for, especially if [they knew] before [they]
stopped [him that he was] not the person [they were] looking for."
(Id. at 41.)

### 2.  Law Enforcement's Version

    The record is very limited regarding law enforcement's
recollection of the Williams stop.  Defendant Officer Chris
McDowell (hereinafter "McDowell") and Defendant Officer Jim Carey
(hereinafter "Carey") of the Toms River Police Department were
involved with the Williams stop on January 15, 2011 in the
McDonald's parking lot.  (Dkt. 43-13, Monaco Certif., Ex. J, Carey

Dep. at 6-8.)[2]  Carey believed that the command post instructed

them to stop Williams's car, but was not positive as there were a

lot of people involved that evening.  (Carey Dep. at 8.)  Capt.

Henry testified that, as with the Canales/Valcourt stop, the

purpose of the stop was that "the individuals matched a possible

description of the suspected shooter."  (Henry Dep. at 19.)

Carey also testified that they were advised over the radio

that there were "friendlies" at the location of the Williams stop.

(Carey Dep. at 14.)  Consistent with Carey's testimony, an entry in

the Toms River Police Department Incident Report from approximately

12:51 A.M. on January 15, 2011 also states, "TO UNITS AT MAC-D'S

TWO UNDERCOVERS IN THE VEHICLE NEXT TO YOU, THEY ARE FRIENDLYS."

(Toms River Police Dep't Incident # 11-2275, at 11.)  The

undercover officers' vehicle was unmarked.  (Carey Dep. at 14.)

Carey and McDowell were wearing tactical gear.  (Id. at 7;

McDowell Dep. at 14.)  Carey testified that he and McDowell

utilized overhead lights to make the stop but did not activate the

sirens.  (Carey Dep. at 13.)  Carey believed that he had a long gun

drawn, but he was not sure whether McDowell's gun was also drawn.

(Id.)  According to Carey, McDowell was controlling the stop, and

Carey was providing cover.  (Id. at 15.)  McDowell testified that

---

[2] McDowell described the interaction as "contact" with a
citizen, and Carey referred to it as a "modified high risk" motor
vehicle stop.  (Carey Dep. at 6, 8, 13; Monaco Certif., Ex. I,
McDowell Dep. at 12.)

he greeted Williams while Williams was in his car and asked him to keep his hands where the officers could see them.  (McDowell Dep. at 12, 14.)  Williams was cooperative and put down his sandwich.  (Id. at 14; see also Carey Dep. at 16.)  Williams asked McDowell, "What's this about," and McDowell replied that he would explain shortly.  (McDowell Dep. at 14.)  McDowell asked Williams to exit the vehicle.  (Id.)  Carey did not remember Williams being handcuffed or being placed in a Toms River police vehicle.  (Carey Dep. at 16.)

Det. Leskowski and Det. Scully, as well as Officer Ed Mooney and Officer P.J. Gambardella, two other defendants in this case, arrived at the Williams stop after the stop had been initiated.  (Id. at 15; Leskowski Dep. at 14-16; Monaco Certif., Ex. K, Mooney Dep. at 13-15; id., Ex. L, Gambardella Dep. at 9.)  According to Carey's testimony, once the vehicle was stopped and the paperwork obtained, "we turned the stop essentially over to Det. Scully for interview purposes."  (Carey Dep. at 16.)  Det. Scully testified that Williams was pleasant and cooperative during their interaction.  (Scully Dep. at 22.)

C.    **Toms River Law Enforcement Protocols**

Plaintiffs have provided the Court with the Toms River Police Department's Training Brief on High Risk Motor Vehicles Stops and Occupant Control.  (See dkt. entry no. 48-9, Stanzione Decl., Ex.

24

I, Toms River Police Dep't Training Br.)  Of note, that document reveals that officers are trained to identify themselves and their purpose when initiating the stop.  (Id. at 91.)  The officer initiating the stop, the primary officer, "issues all commands." (Id. at 92-94.)  Additional units on the scene are directed not to "engage in stop unless requested by primary officer."  (Id. at 94.)

Plaintiffs also submitted a Tom Rivers Police Department Memorandum dated October 1, 2009 from Capt. Henry.  (See dkt. entry no. 48-10, Stanzione Decl., Ex. J, Toms River Police Dep't Mem.) This memorandum describes procedures for responding to critical incidents.  Specifically, the initial responding officer on the scene is designated as the incident commander and becomes the primary contact for managing incoming resources.  (Id.)  That officer remains in command until relieved by a supervisor.  (Id.) The supervisor on the scene is required, inter alia, to generate a "[c]omplete list of all officers on scene."  (Id.)[3]

---

[3] In addition to the foregoing, the parties have submitted, as part of the summary judgment record, reports of purported experts regarding the constitutionality and propriety of Defendants' conduct in this matter.  (See dkt. entry no. 46-3, Rizzo Decl., Ex. A, Manning Report; id., Ex. B, Celeste Report.)  These reports do not add anything factual to the record.  The question of the propriety of Defendants' conduct is an issue of law to be decided by the Court "rather than by expert opinion."  See Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004).  Therefore, the Court will disregard these reports.

## II.   PROCEDURAL HISTORY

Plaintiffs initially filed a complaint in the United States District Court for the District of New Jersey on June 1, 2011. (See dkt. entry no. 1.)  That complaint was amended, and before the Court is Plaintiffs' amended complaint (hereinafter "the Complaint"), which was filed on June 10, 2013.  (See dkt. entry no. 41, Am. Compl.)  The Complaint names as defendants:  Township of Toms River; Toms River Police Department; Scott Kenny; Pat Jacques; Ed Mooney; Jim Carey; Chris McDowell; P.J. Gambardella; Kevin Scully; and the State Police.  (See id.)

Based on the Canales/Valcourt stop and the Williams stop, the Complaint asserts several causes of action, including:

(1)   claims under 42 U.S.C. § 1983 for violations of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution (id. at ¶¶ 33-35);

(2)   claims under 42 U.S.C. § 1983 based on the alleged failure to train, supervise, discipline, and control the individual defendants, thereby demonstrating a "policy of misconduct" (id. at ¶¶ 39-47);

(3)   claims under 42 U.S.C. § 1985 for conspiracy to deprive Plaintiffs of their rights protected by the United States Constitution by using unlawful and excessive force (id. at ¶¶ 36-38); and

(4)   several state claims, such as assault, malicious prosecution, false arrest, and negligence (id. at ¶¶ 48-72).

Township Defendants cross-claimed against the State Police for contribution and indemnification if they are held liable to

Plaintiffs.  (See dkt. entry no. 42, Twp. Defs.' Answer, Cross-
Claims, & Counterclaim.)  They also counterclaimed against
Plaintiffs arguing that the Complaint was frivolous and seeking
attorneys' fees under 42 U.S.C. § 1988.  (See id.)

All of the defendants have moved for summary judgment against
Plaintiffs.  (See dkt. entry no. 43, Twp. Defs.' Mot. for Summ. J.;
dkt. entry no. 46, State Police Mot. for Summ. J.)  The State
Police also moved for summary judgment as to the cross-claims
asserted against them by the Township Defendants.  (State Police
Mot. for Summ. J.)

### III.  SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56, which
provides that the Court "shall grant summary judgment if the movant
shows that there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(a).  The movant has the initial burden of proving
the absence of a genuinely disputed material fact relative to the
claims in question.  Celotex Corp. v. Catrett, 477 U.S. 317, 323,
331 (1986).  Material facts are those "that could affect the
outcome" of the proceeding, and "a dispute about a material fact is
'genuine' if the evidence is sufficient to permit a reasonable jury
to return a verdict for the non-moving party."  Lamont v. New
Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp., 477 U.S. at 322-23).

If the movant demonstrates an absence of genuinely disputed material facts, then the burden shifts to the non-moving party to demonstrate, through specific facts, the existence of at least one genuine issue for trial. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Williams v. Borough of W. Chester, 891 F.2d 458, 460-61 (3d Cir. 1989). Summary judgment is "proper if, viewing the record in the light most favorable to the non-moving party and drawing all inferences in that party's favor, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## IV.  PARTIES' ARGUMENTS

### A.  Township Defendants' Arguments

Township Defendants argue that Plaintiffs have failed to establish the liability of the Township of Toms River and the Toms River Police Department (collectively "Toms River") based on a municipal custom or policy. (Dkt. entry no. 43-3, Twp. Defs.' Br.

28

in Supp. of Mot. for Summ. J. at 9.)   The burden is on Plaintiffs to establish the policy or custom that violated their constitutional rights, and such policy or custom cannot be based on a single act.  (Id. at 10 (citing Fletcher v. O'Donnell, 867 F.2d 791, 793 (3d Cir. 1989); Gittlemacker v. Prasse, 428 F.2d 1, 3 (3d Cir. 1970)).)   Plaintiffs have failed to present any facts that would support their claim that Toms River had an official policy (or that there existed a custom or practice) to violate a citizen's constitutional rights.  (Id. at 11-12.)   Nor can Plaintiffs show that the police officers involved had policymaking authority that could give rise to municipal liability.  (Id. at 12.)   Finally, Plaintiffs did not establish that the municipality failed to train and supervise its employees and that such failures rose to a level of deliberate indifference.  (Id. at 12-13.)

Township Defendants further contend that the individual police officers are entitled to qualified immunity.  (Id. at 14.)   First, the stops themselves did not violate the constitutional rights of Plaintiffs because: (a) a police officer was murdered earlier in the day; (b) Plaintiffs were at the Pub, which is part of the Hotel, and the police were notified that the suspect was possibly staying at the Hotel; and (c) Plaintiffs matched the description of the suspected shooter.  (Id. at 15-16.)   Secondly, with respect to the allegations of excessive force at the Canales/Valcourt stop,

the Township Defendants assert that the Toms River officers present at the scene were not involved in the removal of Canales from his vehicle.  (Id. at 16.)  Sgt. Kenny and Officer Jacques, the Toms River personnel at the stop, were wearing tactical gear, but Canales and Valcourt testified that they were removed from the vehicle by plain-clothes officers.  (Id. at 16-17.)  With respect to the Williams stop, nothing in the record suggests that any force was used against Williams.  (Id. at 18.)  Rather, he was taken from his vehicle, patted down, and then asked a series of questions. (Id. at 17.)  He was not handcuffed, and he did not suffer any injuries.  (Id. at 17-18.)

Township Defendants also contend that they should be granted summary judgment on the 42 U.S.C. § 1985 claims against them for conspiracy to deprive Plaintiffs of their federal rights because Plaintiffs have failed to allege or establish discriminatory animus or a conspiratorial agreement.  (Id. at 19-20.)  Finally, Township Defendants argue that summary judgment should be granted on the state law claims for the same reasons that the federal claims cannot succeed -- namely, that the Toms River officers did not have any physical contact with Plaintiffs and that Plaintiffs failed to demonstrate any pattern of prior, similar events.  (Id. at 21-22.)

**B.   New Jersey State Police's Arguments**

The State Police assert that the State Police itself and the unnamed individual officers in their official capacities, as arms of the State of New Jersey, are entitled to sovereign immunity, and thus, the claims against them for money damages are barred by the Eleventh Amendment of the United States Constitution.  (Dkt. entry no. 46-1, State Police's Br. in Supp. of Mot. for Summ. J. at 4-5 (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 70-71 (1989)).)  The State of New Jersey has not waived this immunity for suits in federal court.  (Id. at 6.)  Moreover, the State Police argue that state officials in their official capacities and the state itself are not "persons" for purposes of 42 U.S.C. § 1983. (Id. at 9-11 (citing Will, 491 U.S. at 64).)

The State Police further seek summary judgment on Plaintiffs' claims against it under section 1983 premised on respondeat superior liability because the statute precludes recovery on this theory.  (Id. at 11.)  The standard for imposing liability premised on the supervisor's failure to train is "extremely high" and requires the plaintiff to show that the supervisor's actions were the moving force behind the violation.  (Id. at 12-14.)  The State Police argue that, because Plaintiffs have no facts to support the claim for supervisory liability beyond conclusory statements, it

31

should be granted summary judgment on the claims for supervisory liability against the State Police.  (Id. at 14-15.)

The State Police conclude that it should be granted summary judgment on the state constitutional and tort claims asserted against it because Plaintiffs have failed to prove "beyond mere assumption and surmise" that any of the identified law enforcement officers were in fact members of the State Police.  (Id. at 15.) Because Plaintiffs cannot establish that the unidentified officers were members of the State Police, the State Police cannot be held liable for failure to train or discipline such officers merely based on a theory of respondeat superior or vicarious liability. (Id.)

C.   **Plaintiffs' Arguments**

Plaintiffs argue that there are various issues of material fact that preclude the granting of summary judgment.  (Dkt. entry no. 48, Pls.' Br. in Opp'n of Mot. for Summ. J. at 7.)  For example, Valcourt identified Sgt. Kenny as the individual who assaulted Canales, which contradicts the Township Defendant's assertion that Toms River officers did not have physical contact with Plaintiffs.  (Id.)  Even if Sgt. Kenny was not the aggressor, Plaintiffs assert that "Sgt. Kenny directed and was responsible for unwarranted conduct of all officers."  (Id.)  Furthermore, Plaintiffs argue that the purported basis for the motor vehicle

stop -- that they matched the description of the suspect -- is questionable because the suspect was nineteen years old, and all Plaintiffs were between the ages of thirty-three and forty-four. (Id.)  Plaintiffs contend that the only characteristic they share in common with the suspect is ethnicity -- African American.  (Id.)

Plaintiffs argue that they have successfully asserted municipal liability against Toms River based on its failure to train or supervise its employees with respect to high-risk motor vehicle stops.  (Id. at 8-9.)  The Toms River Police Department has a training brief addressing the protocol for high-risk motor vehicle stops, and Capt. Henry sent a memorandum to all police personnel addressing the protocol for critical incident response. (Id. at 9-10.)  The officers did not follow these protocols in the stops of Plaintiffs.  (Id. at 9-10.)  Specifically, the training brief directs officers to give a series of commands to motor vehicle occupants on how to exit the vehicle, but the officers at the Canales/Valcourt stop did not give these commands and instead pulled Canales out of the vehicle.  (Id. at 9.)  The memorandum directs the incident commander -- the first responding officer on the scene and thus Sgt. Kenny at the Canales/Valcourt stop -- to gather a complete list of all officers on the scene, but Sgt. Kenny neglected to obtain this information.  (Id. at 10.)

Plaintiffs contend that the individual Toms River police officers are not entitled to qualified immunity because they failed to protect Plaintiffs from bodily harm.  (Id. at 11-12.)  They argue that it is no defense that the Toms River officers at the Canales/Valcourt stop were not involved in the removal of Canales from the car because (a) Valcourt testified that Sgt. Kenny in fact removed Canales, which creates a fact issue, and (b) the stop was made under Sgt. Kenny's control.  (Id. at 13-16.)  Plaintiffs also assert that "more than enough force" was used in the Williams stop, and it is undisputed that the Williams stop "would have traumatized any individual."  (Id. at 15.)

With respect to the section 1985 conspiracy claim, Plaintiffs argue that they were racially profiled, which supports a claim of a conspiracy motivated by discriminatory animus.  (Id. at 16-17.)  As to the state-law claims, Plaintiffs argue that Defendants are not entitled to good faith immunity under state law (N.J.S.A. 59:3-3) because the question of good faith is typically one for the finder of fact.  (Id. at 18-19.)  They assert that summary judgment should be denied on these state-law claims for the same reasons it should be denied on the federal claims.  (Id. at 19-21.)  Finally, Plaintiffs argue that the State Police are not entitled to summary judgment because there is an issue of material fact as to whether

34

they were involved in the stops.  (Id.)  This issue of fact was created by Toms River.  (Id. at 22.)

**D.    Township Defendants' Reply**

The Township Defendants argue that a single incident is generally insufficient to support a failure to train/supervise claim, and Plaintiffs have not identified other, similar incidents. (Dkt. entry no. 50, Twp. Defs.' Reply Br. at 2.)  With regard to Plaintiffs' arguments against qualified immunity based on the alleged dispute of fact as to whether Sgt. Kenny physically removed Canales from the vehicle, the Township Defendants argue that "the record is overwhelmingly clear that the Toms River officers at the various scenes were dressed in 'SWAT' gear," and thus, the Toms River officers were not involved in the removal of Canales from the vehicle.  (Id. at 3.)

**E.    State Police's Reply**

The State Police argue that Plaintiffs conceded that their belief in the involvement of the State Police in the Canales/Valcourt stop is based only on representations of Toms River personnel. (Dkt. entry no. 51, State Police Reply Br. at 1-2.)  However, the testimony of the Toms River officers is clear that they were merely assuming that the plain-clothes officers were State Police officers.  (Id. at 2-3.)  These conclusory and

35

assumptive statements are not based on personal knowledge and are not admissible testimony at trial.  (Id. at 4.)

## V.    ANALYSIS

### A.    Liability of Government Actors

There are three groups of government actors that are defendants in this case: (1) the State Police; (2) the individual municipal defendants; and (3) the municipality -- the Township of Toms River.  There are different standards governing the liability of these three different groups of defendants in federal court.

#### 1.    The New Jersey State Police

The State Police as an entity of the State of New Jersey is entitled to state-sovereign immunity under the Eleventh Amendment. The Eleventh Amendment provides, "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."  U.S. Const. amend. XI.  With a few exceptions, the Eleventh Amendment prevents a state entity from being a defendant in a lawsuit.

Congress can abrogate state-sovereign immunity through an unequivocal expression, or a state can waive its own immunity to suit.  Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999).  But Congress did not abrogate

state-sovereign immunity in section 1983.  Kentucky v. Graham, 473

U.S. 159, 169 n.17 (1985).  And the State of New Jersey has not

waived its sovereign immunity in federal courts.  Lassoff v. New

Jersey, 414 F.Supp.2d 483, 488 (D.N.J. 2006) (dismissing claims

asserted against the New Jersey State Police and its officials in

their official capacities as barred by the Eleventh Amendment).

Thus, none of these exceptions are present in this case.

     In addition to these immunity issues, states and state

officials in their official capacities, are not "persons" for

section 1983 purposes.  Will, 491 U.S. at 64-65.  Therefore, the

Court will grant summary judgment to the State Police as to all

direct claims and cross-claims.

     Plaintiffs have also asserted claims against unnamed

individual officers of the New Jersey State Police.  Claims against

the individual officers in their individual capacities would not be

barred by the Eleventh Amendment.  Lassoff, 414 F.Supp.2d at 489.

However, following ample discovery, Plaintiffs have not been able

to identify any individual State Police officers.  The belief that

such officers were present at the stops arises only from the call

information log transcript (which does not identify any individual

officers) and from speculation by Toms River officers during their

depositions.  Because Plaintiffs have failed to identify any

37

individual State Police officers during discovery, Plaintiffs'
claims against these unnamed officers cannot proceed.

### 2.    The Individual Toms River Officers

The individual Toms River police officers have all asserted
that they are protected by the doctrine of qualified immunity.
"Qualified immunity is intended to shield government officials
performing discretionary functions, including police officers,
'from liability from civil damages insofar as their conduct does
not violate clearly established statutory or constitutional rights
of which a reasonable person would have known.'"  Kopec v. Tate,
361 F.3d 772, 776 (2004) (quoting Harlow v. Fitzgerald, 457 U.S.
800, 818 (1982)).  Qualified immunity is not merely a defense from
liability but is also immunity from the lawsuit itself.  Saucier v.
Katz, 533 U.S. 194, 200 (2001).  For this reason, the United States
Supreme Court has urged lower courts to resolve it as early as
possible in the litigation.  Id. at 200-01.

The defendant government official bears the burden of
establishing the right to qualified immunity.  Kopec, 361 F.3d at
776.  In determining the applicability of qualified immunity,
courts must "ask: (1) whether the facts alleged by the plaintiff
show the violation of a constitutional right, and (2) whether the
law was clearly established at the time of the violation."  Kelly

v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010)

[hereinafter "Kelly I"] (citing Saucier, 533 U.S. at 201).[4]

"For a constitutional right to be clearly established, its

contours must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right." Hope

v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks and

citation omitted).  "This inquiry 'must be undertaken in light of

the specific context of the case.'" Kelly I, 622 F.3d at 253

(quoting Saucier, 533 U.S. at 201).  The Court of Appeals for the

Third Circuit "has adopted a broad view of what constitutes an

---

[4] The United States Supreme Court had initially intended for
these inquiries to be resolved sequentially.  A determination that
the first inquiry was not satisfied -- i.e., that the facts alleged
viewed in the light most favorably to the plaintiff would not
violate a constitutional right -- would end the analysis, and the
official would be entitled to immunity.  See Saucier, 533 U.S. at
201; Kopec, 361 F.3d at 776.  A court would only inquire as to
whether the right was "clearly established" if the first step was
answered affirmatively and there were a violation of constitutional
rights.  Saucier, 533 U.S. at 201.  However, the Court later ruled
that judges are "permitted to exercise their sound discretion in
deciding which of the two prongs of the qualified immunity analysis
should be addressed first in light of the circumstances in the
particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236
(2009).  The Court stated a preference for the order it initially
articulated in Saucier, but explained that some circumstances might
warrant answering the "clearly established" inquiry first.  See id.
For example, "[t]here are cases in which it is plain that a
constitutional right is not clearly established but far from
obvious whether in fact there is such a right." Id. at 237.  The
Court believed that allowing the second inquiry to be resolved
first in some cases would avoid an unnecessary academic exercise by
judges and the unnecessary expenditure of scarce judicial
resources.  Id.

established right of which a reasonable person would have known."
Kopec, 361 F.3d at 778 (quoting Burns v. Cnty. of Cambria, 971 F.2d
1015, 1024 (3d Cir. 1992)).  "'[O]fficials can still be on notice
that their conduct violates established law even in novel factual
circumstances,' as long as the law gave the defendant officer 'fair
warning' that his conduct was unconstitutional."  Kelly I, 622 F.3d
at 259-60 (quoting Hope, 536 U.S. at 741).

     "If the wrongfulness of the officer's conduct would have been
clear," a court must consider "whether the officer made a
reasonable mistake as to what the law requires."  Carswell v.
Borough of Homestead, 381 F.3d 235, 242, 243 (3d Cir. 2004).
"[T]here are circumstances wherein a police officer's violation of
a law may be within the bounds of reason, even though the law in
question can be said, from the comfort of an armchair, to be
'clearly established.'"  Kelly v. Borough of Carlisle, Nos. 12-
4020, 12-4021, 2013 WL 6069275, at *4 (3d Cir. Nov. 19, 2013)
[hereinafter "Kelly II"].  "The qualified immunity standard gives
ample room for mistaken judgments by protecting all but the plainly
incompetent or those who knowingly violate the law."  Kelly I, 622
F.3d at 254 (quoting Gilles v. Davis, 427 F.3d 197, 203 (3d Cir.
2005)).  "[Q]ualified immunity may be granted when there is a
breakdown in the legal fiction that reasonably competent police
officers know every clearly established law."  Kelly II, 2013 WL

6069275, at *6.  However, the Third Circuit has cautioned that
"[i]f the law was clearly established, the immunity defense
ordinarily should fail, since a reasonably competent public
official should know the law governing his conduct."  Kelly I, 622
F.3d at 254 (quoting Harlow, 457 U.S. at 818-19).

"[Q]ualified immunity is an objective question to be decided
by the court as a matter of law."  Carswell, 381 F.3d at 242.
However, the jury "determines disputed historical facts material to
the qualified immunity question."  Id.  A district court may employ
special interrogatories to the jury for this purpose.  Id.  Once
the jury resolves the disputed facts, "[t]he court must make the
ultimate determination on the availability of qualified immunity as
a matter of law."  Id.; see also Harvey v. Plains Twp. Police
Dep't, 421 F.3d 185, 194 n.12 (3d Cir. 2005).

For each claim, the Court will apply this framework to each
individual defendant to the extent the claims are asserted against
him and determine whether that defendant is entitled to immunity.

### 3.   The Municipality

A municipality, like Toms River, may not be held liable under
section 1983 on a vicarious liability theory.  Monell v. Dep't of
Soc. Servs., 436 U.S. 658, 694 (1978).  Rather, "it is when
execution of a government's policy or custom, whether made by its
lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id.

Municipal liability may be established by an official policy, by a custom or practice, by the failure of decision makers to adequately train employees, or by actions taken or decisions made by a municipal employee who is responsible for establishing municipal policy on relevant topics. City of Canton v. Harris, 489 U.S. 378, 387 (1989); Monell, 436 U.S. at 694; Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 250 (3d Cir. 2007). However, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, 489 U.S. at 388.

"[A] plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). However, this does not necessarily require the plaintiff's evidence to identify the responsible decision maker, as "[p]ractices so permanent and well settled as to have the force of law [are] ascribable to municipal decisionmakers." Id. (internal quotation marks and citation omitted).

42

"Once a § 1983 plaintiff identifies a municipal policy or custom, he must 'demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged.'" Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997)); see also Kelly I, 622 F.3d at 263.  If a plaintiff identifies a policy that is itself unconstitutional, the plaintiff need not additionally show a pattern of constitutional deprivations.  See Brown v. City of Pittsburgh, 586 F.3d 263, 292 (3d Cir. 2009).  However, if "the policy or custom does not facially violate federal law, causation can be established only by 'demonstrat[ing] that the municipal action was taken with deliberate indifference as to its known or obvious consequences.  A showing of simple or even heightened negligence will not suffice.'" Berg, 219 F.3d at 276 (quoting Bd. of Cnty. Comm'rs of Bryan Cnty., 520 U.S. at 407).

Where a policy is not itself unconstitutional, the general rule is that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell." Brown, 586 F.3d at 292-93, 296 (quoting City of Okla. City v. Tuttle, 471 U.S. 808, 823-84 (1985)).  "Failure to adequately screen or train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern

of violations." Berg, 219 F.3d at 276. The Third Circuit has stated that it is conceivably possible to maintain a failure-to-train claim without showing a pattern, but "the burden on the plaintiff in such a case is high." Id. (noting Canton's example of arming officers without training them). Moreover, the deficiency in training must be closely related to the ultimate injury; merely proving that the injury could have been avoided with better training is insufficient to impose municipal liability. Kline v. Mansfield, 255 Fed.Appx. 624, 629 (3d Cir. 2007).

**B.   The Claims**

   **1.   Claims Brought Under Section 1983**

   The majority of Plaintiffs' claims are brought under 42 U.S.C. § 1983. In order to state a prima facie case pursuant to section 1983, "the plaintiff must demonstrate that a person acting under the color of law deprived him of a federal right." Berg, 219 F.3d at 268. Section 1983 itself "is not a source of substantive rights and does not provide redress for common law torts." Id. Rather, it is the vehicle through which plaintiffs can seek redress against government officials for violations of federal statutory and constitutional rights. See id.

   Township Defendants do not dispute that they were acting under the color of state law at the time of the events in question. The issues before the Court are whether Plaintiffs' rights were in fact

44

violated and whether Township Defendants can be held liable for those violations.

### a.   Eighth Amendment Claims

Plaintiffs assert that their rights to "protection from cruel and unusual punishment secured by the Eighth Amendment" were violated by Township Defendants' conduct.  (Am. Compl. at ¶ 34.)  However, it is undisputed that Plaintiffs were never criminal defendants and were not prosecuted in connection with these stops.  Therefore, the Eighth Amendment is not the relevant constitutional guarantee.  As the United States Supreme Court has stated,

> [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.  Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.

Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977).  Therefore, the Court will grant Township Defendants' motion for summary judgment on the Eighth Amendment claims.

### b.   Due Process Claims

Plaintiffs also argue that the actions of Township Defendants deprived them of their rights to life, liberty, and property without due process of law.  (Am. Compl. at ¶ 34.)  However, "when government behavior is governed by a specific constitutional amendment, due process analysis is inappropriate."  Berg, 219 F.3d

45

at 268.  Plaintiffs here challenge the constitutionality of the
stops and the force used in executing the stops, which is governed
by the Fourth Amendment.  See Graham v. Connor, 490 U.S. 386, 394
(1986) (stating that section 1983 claims regarding investigatory
stops and excessive force claims in the context of such stops are
"most properly characterized as [claims] invoking the protections
of the Fourth Amendment").  Therefore, the Court will grant
Township Defendants' motion for summary judgment as to Plaintiffs'
due process claims.

### c.    Sixth Amendment Claims

Plaintiffs allege that Township Defendants' actions also
violated their Sixth Amendment right "to be informed of the nature
and cause of the accusation against them."  (Am. Compl. at ¶ 34.)
However, as the Court has stated with regard to the Eighth
Amendment claims, Plaintiffs were never criminally charged or
prosecuted.  As a result, the protections afforded by the Sixth
Amendment are not applicable.  See Kelly v. Borough of Sayreville,
107 F.3d 1073, 1076 (3d Cir. 1997) (affirming the district court's
dismissal of the plaintiff's Sixth Amendment claim because the
plaintiff was "not a criminal defendant" and thus those protections
were not applicable).  The Court will grant summary judgment to
Township Defendants on the Sixth Amendment claims as well.

46

### d.   Fourth Amendment Claims

The crux of actions alleged in the Complaint fall within the ambit of the Fourth Amendment.  The Court will address the constitutionality of (1) the stops; (2) the government officials' conduct during the stops; and (3) the amount of force used by the officials.

### i.   The Stops

The Fourth Amendment prevents "unreasonable searches and seizures."  U.S. Const. amend. IV.  The Third Circuit has adopted a three-step process for analyzing a plaintiff's section 1983 Fourth Amendment seizure claim:

> First, we must determine whether he was seized for Fourth Amendment purposes.  If so, we next determine whether that seizure violated the Fourth Amendment's prohibition against unreasonable seizures.  Finally, if there has been a Fourth Amendment violation, we must determine which of the defendants, if any, may be held liable for it.

Berg, 219 F.3d at 269.

### (a)   Was there a seizure?

A person is seized for purposes of the Fourth Amendment "if he is detained by means intentionally applied to terminate his freedom of movement."  Id.   Traffic stops result in temporary seizures of both drivers and passengers.  Arizona v. Johnson, 555 U.S. 323, 333 (2009); Brendlin v. California, 551 U.S. 249, 263 (2007).  Defendants do not, nor could they, seriously challenge that

47

Plaintiffs were subjected to a seizure for Fourth Amendment
purposes when law enforcement officers pulled them over after they
left the Pub.  See United States v. Fogle, 515 F.Supp.2d 474, 483
(D.N.J. 2007) ("We find that in this case a Fourth Amendment
seizure of defendant occurred when the [vehicle] pulled over and
stopped [on the street] in response to police lights, and defendant
complied with the police directive over the PA system that he
remain in the vehicle.")

### (b)   Does the seizure violate the Fourth Amendment?

The general rule is that, in order for a seizure to be
reasonable, "it must be effectuated with a warrant based on
probable cause." United States v. Robertson, 305 F.3d 164, 167 (3d
Cir. 2002) (citing Katz v. United States, 389 U.S. 347, 356-57
(1967)).  However, under Terry v. Ohio, 392 U.S. 1 (1968), in the
absence of a warrant, an officer may, without running afoul of the
Fourth Amendment, "conduct a brief, investigatory stop when the
officer has reasonable, articulable suspicion that criminal
activity is afoot." Robertson, 305 F.3d at 167 (quoting Illinois
v. Wardlow, 528 U.S. 119, 123 (2000)).  "This rule applies whether
the criminal activity is ongoing or has already been completed."
Fogle, 515 F.Supp.2d at 482.

Reasonable suspicion is a lower "standard than probable cause
and requires a showing considerably less than preponderance of the

evidence." <u>Wardlow</u>, 528 U.S. at 123.  It "can be established with information that is different in quantity or content than that required to establish probable cause" and "can arise from information that is less reliable than that required to show probable cause." <u>Alabama v. White</u>, 496 U.S. 325, 330 (1990). Courts must consider the "totality of the circumstances" in determining the existence of reasonable suspicion.  <u>Robertson</u>, 305 F.3d at 167.  The analysis for reasonable suspicion is objective, and the subjective intent of the officer is not relevant.  <u>United States v. Goodrich</u>, 450 F.3d 552, 559 (3d Cir. 2006).

Notwithstanding that the reasonable suspicion standard is less demanding than the standard for probable cause, reasonable suspicion "unequivocally demands that 'the detaining officers must have a <u>particularized and objective basis</u> for suspecting the <u>particular person</u> stopped of criminal activity.'" <u>United States v. Brown</u>, 448 F.3d 239, 247 (3d Cir. 2006) (emphasis added) (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981)).  "[T]he 'reasonable suspicion' inquiry is highly fact-dependent in nature." <u>Goodrich</u>, 450 F.3d at 553.

Reasonable suspicion can arise from a combination of one or more factors, including:

> specialized knowledge and investigative inferences . . . , personal observation of suspicious behavior . . . , information from sources that have proven to be reliable, and information from sources that -- while unknown to the

> police -- prove by the accuracy and intimacy of the
> information provided to be reliable at least as to the
> details contained within that tip . . . .

United States v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002) (internal
citations omitted).  While reasonable suspicion may arise from
information obtained from other sources, Adams v. Williams, 407
U.S. 143, 147 (1972), officers must have "some 'reason to believe
not only that the [tipster] was honest but also that he was well
informed.'"  Brown, 448 F.3d at 250 (quoting White, 496 U.S. at
332).

Courts use a flexible standard assessing the reliability and
value of a tip in light of the totality of the circumstances.
United States v. Valentine, 232 F.3d 350, 354-57 (3d Cir. 2000)
(finding reasonable suspicion based on face-to-face tip in
conjunction with surrounding circumstances).  Circumstances that
may contribute to a finding of reasonable suspicion or can serve to
"corroborate an otherwise insufficient tip" include:  the
individual's presence in a high crime area; the individual's
presence on the street in late hours; nervous or evasive behavior;
and walking away or fleeing from police.  Brown, 448 F.3d at 251;
see also United States v. Navedo, 694 F.3d 463, 470-72 (3d Cir.
2012); Valentine, 232 F.3d at 356-57.  Moreover, when a tip is one
of the primary reasons for the stop, that tip "must provide a
particularized and objective basis for suspecting (1) the

50

particular persons stopped (2) of criminal activity." Goodrich, 450 F.3d at 560.

Courts are mindful that the determination of whether reasonable suspicion exists is often made by officers on the fly under exigent circumstances. Robertson, 305 F.3d at 168. As a result, courts are "reluctant to 'second-guess' investigative decisions made by officers in hot pursuit of criminal suspects." Id. at 167.

With respect to stops that have been made on the basis of a third-party's description of a suspect, the Third Circuit has emphasized that the description must "satisfy the Fourth Amendment's 'demand for specificity.'" Brown, 448 F.3d at 247 (quoting Terry, 392 U.S. at 21 n.18.). For example, the Third Circuit has found that the description of "African-American males between 15 and 20 years of age, wearing dark, hooded sweatshirts and running south on 22nd Street" in Philadelphia, who were approximately 5'8" and 6' tall, was insufficient to give rise to reasonable suspicion for a stop. Id. at 247-48. In contrast, a description of "the two-toned color of the car, the presence of a third brake light in the rear window, and five or more young, white, male passengers" was found, along with other factors, to support reasonable suspicion. Id. at 248 (citing Nelson, 284 F.3d at 481 n.5). Moreover, when the individual detained does not

51

closely resemble the description of the suspect, that description alone will not support a finding of reasonable suspicion.  See id. ("Indeed, about the only thing Brown and Smith had in common with the suspects is that they were black.").

The Court in this case cannot conclude that the stops were supported by reasonable suspicion.  Sgt. Kenny, Jacques, and Carey did not know with certainty the purpose or justification for the stops, but testified that they stopped Plaintiffs' vehicles because they were ordered to from the command post and assumed that the command post thought that Plaintiffs might have some connection to the suspect or the shooting.  (Carey Dep. at 8; Jacques Dep. at 7; Kenny Dep. at 7, 9, 43.)  Capt. Henry testified that both the Canales/Valcourt stop and the Williams stop were made because the individuals involved matched the description of the suspect. (Henry Dep. at 19.)  However, the record does not contain any information as to what the description of the suspect was.  Nor does it reveal how police developed the description of the suspect or why police believed the shooter was in the vicinity of the Hotel.  Moreover, the record does not address why police believed that Plaintiffs matched the description of the suspect.  Therefore, the Court is unable to evaluate the totality of the circumstances, including the reliability of the command post's basis of knowledge

52

and the specificity of any description.  See Brown, 448 F.3d at
247, 250-51; Valentine, 232 F.3d at 354-57.

Plaintiffs have argued that the vehicles of Canales and
Williams do not resemble one another, and therefore, they could not
have resembled any description of a vehicle utilized by the
suspect.  (Pls.' Br. in Opp'n of Mots. for Summ. J. at 7.)
Furthermore, they have argued that the suspect was nineteen years
old, and Plaintiffs are between thirty-three and forty-four years
of age; thus, Plaintiffs could not have resembled the suspect.
(Id.)  They assert that the only trait they have in common with the
suspect is that they are African American (id.), which, if true,
would be inadequate to support reasonable suspicion.  Brown, 448
F.3d at 248.  Township Defendants have not responded to this line
of argument.

Given the absence of information relating to the source of the
description of the suspect and how Plaintiffs resembled this
description, the Court cannot conclude that these stops were based
on reasonable suspicion.  This is not to say conclusively that
reasonable suspicion did not support the stops.  Rather, the Court
cannot conclude that reasonable suspicion existed based on the
inadequate record here.  Thus, the Court will assume for the
purposes of analyzing liability for the stop that the stop in fact
violated Plaintiffs' Fourth Amendment rights.

### **(c)  Who is liable?**

Since the Court cannot conclude that reasonable suspicion supported the stop, the Court will next determine who, if anyone, is liable for the violation.  The individuals identified as defendants in this case are Sgt. Kenny, Jacques, Mooney, Carey, McDowell, Gambardella, and Det. Scully.  (See Am. Compl.)  However, not one of these defendants is the individual responsible for ordering the cars stopped and thus the individual who would have needed reasonable suspicion for the stops.  The individual who ordered the stops has not been identified, and the parties have reached the close of discovery.

The Court finds that the individual defendants are entitled to qualified immunity.  "Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists . . . ."  Myers v. Med. Ctr. of Del., 28 Fed.Appx. 163, 167 (3d Cir. 2002) (quoting Bilida v. McCleod, 211 F.3d 166, 174-75 (1st Cir. 2000)); see also United States v. Hensley, 469 U.S. 221, 232 (1985) (stating that a stop made in reliance on a flyer or broadcast issued without reasonable suspicion violates the Fourth Amendment, but an officer making the stop would be entitled to qualified immunity).

The facts here show that numerous officers from a variety of law enforcement agencies were cooperating in the pursuit of an armed suspect who had shot another police officer.  Their activities in this pursuit were coordinated by the command posts.  The command posts, comprised of other officers, radioed officers in the field and directed them to stop certain vehicles whose occupants may have had involvement in the shooting.  It was objectively reasonable for officers in the field to believe that the officers at the command post had reasonable suspicion for the stops.  Therefore, the individual defendants who made these stops in reliance on the directives of their peers and superiors are entitled to qualified immunity.  See Rogers v. Powell, 120 F.3d 446, 456 (3d Cir. 1997) (officer who had been inaccurately told by another officer that there was a warrant for the plaintiff's arrest was immune from suit).  The Court will grant summary judgment to Defendants Sgt. Kenny, Jacques, Mooney, Carey, McDowell, Gambardella, and Det. Scully on Plaintiffs' claim for a Fourth Amendment violation based on the stop itself.

### ii.  Conduct During the Stops

Plaintiffs also allege that the conduct of Township Defendants during the stop also violated their constitutional rights.  The conduct of law enforcement during the course of a stop can convert an investigatory stop into an arrest for Fourth Amendment purposes.

See Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995).  In evaluating police conduct, a court will consider the "intrusiveness of all aspects of the incident" and the reasonableness of the officers' conduct in terms of their concerns for safety.  See id. The issue is that, once the officers' conduct, in light of the surrounding circumstances, becomes unreasonable and the stop is transformed into an arrest, probable cause is required for the detention.

The Court, in considering Township Defendants' actions throughout the course of the stop, is cognizant that "traffic stops are 'especially fraught with danger to police officers.'"  Johnson, 555 U.S. at 330 (quoting Michigan v. Long, 463 U.S. 1032, 1047 (1983)).  This risk of harm can be minimized "if the officers routinely exercise unquestioned command of the situation."  Id. (quoting Maryland v. Wilson, 519 U.S. 408, 414 (1997)).

The Court will consider each type of Township Defendants' alleged conduct during the stops to evaluate whether the actions were reasonable.

### (a)   Impact of the Toms River Police Department Protocols

As an initial matter, the Court finds that the Toms River training brief and critical response memorandum and any failure to follow them do not, in and of themselves, amount to a violation of Plaintiffs' federally secured rights.  These protocols may aid in

56

the orderly administration of a stop by creating presumptions of which officer is in charge of the stop and by encouraging that officer to compile a list of all individuals on the scene.  (See e.g., Toms River Police Dep't Mem.)  But failure to abide by these protocols does not necessarily result in a violation of a citizen's Fourth Amendment rights.  The manner in which they executed the stop and their conduct during the stop may still be deemed reasonable for constitutional purposes, even if not commendable. See Ray v. Twp. of Warren, 626 F.3d 170, 178 n.14-15 (3d Cir. 2010) (explaining that officer's failure to follow internal protocol did not inherently reflect a lack of reasonableness and stating, "Although the officers acted within the bounds of reasonableness, we cannot say that all of their actions were commendable.").  Therefore, the Court finds that Township Defendants' alleged failure to follow department protocols did not amount to a Fourth Amendment violation.

### (b)   Display of Weapons

The Court will examine the officers' display of guns during the stops.  The undisputed facts show that Sgt. Kenny and Jacques approached Canales's vehicle with their guns drawn.  Similarly, it is undisputed that Carey had a gun pointed at Williams during the course of the stop.  It is unclear from the record whether McDowell also had a gun pointed at Williams.  Williams testified that

McDowell also had a gun pointed at him, Carey testified that he was
not sure if McDowell also had a gun pointed at Williams, and the
record is silent as to McDowell's testimony on the issue.  (See
Williams Dep. at 23; Carey Dep. at 13.)

There is no per se rule prohibiting the use of guns at an
investigatory stop.  Baker, 50 F.3d at 1193; United States v.
Trullo, 809 F.2d 108, 113 (1st Cir. 1987) (use of a gun at stop
does not automatically convert stop into an arrest requiring
probable cause).  The question for the Court is whether the use of
guns at the stop was reasonable under the circumstances.  Baker, 50
F.3d at 1193; see also United States v. Eisenberg, 807 F.2d 1446,
1451 (8th Cir. 1986) ("The officers may take such steps as are
reasonably necessary to protect their personal safety and to
maintain the status quo so that the limited purpose of the stop may
be achieved." (internal quotation marks and citation omitted));
United States v. Hardnett, 804 F.2d 353, 357 (6th Cir. 1986)
("Where the display or use of arms is viewed as reasonably
necessary for the protection of the officers, the courts have
generally upheld investigatory stops made at gunpoint." (internal
quotation marks and citations omitted)).

The Court finds that the use of guns here was reasonable.
Township Defendants, having been ordered to stop the vehicles of
Canales and Williams as part of a manhunt for an armed suspect who

had shot a police officer, would have been concerned for their safety in approaching these vehicles and their occupants.  See Hardnett, 804 F.2d at 357 (finding that it was reasonable for officers to display their weapons when approaching a vehicle that officers had been told contained armed occupants).  Therefore, the Court finds that Plaintiffs' rights were not violated by the officers' display of their guns.

### (c)   Removal from Vehicles

It is also undisputed that after the stop was made, all three Plaintiffs were removed from the vehicles, Canales and Valcourt by the plain-clothes officers and Williams by McDowell with Carey right near him.[5]  This does not offend the Fourth Amendment.  Once a vehicle has been lawfully stopped -- and the Court has already concluded that the Township Defendants did not violate Plaintiffs' rights with regard to the stop -- officers are permitted to remove both the driver and passengers from the vehicle.  See Johnson, 555 U.S. at 331 (citing Wilson, 519 U.S. at 415; Pennsylvania v. Mimms, 434 U.S. 106, 110-11 (1977)).  Plaintiffs' rights were not violated by their removal from their vehicles.

### (d)   Use of Handcuffs

The undisputed facts also show that Canales and Valcourt were handcuffed during the stop.  As with the displaying of guns, the

---

[5] The manner in which they were removed will be addressed under the excessive force analysis.

fact that citizens are handcuffed in the course of an investigatory stop does not necessarily turn that stop into an arrest. Baker, 50 F.3d at 1193; United States v. Kapperman, 764 F.2d 786, 790 n.4 (11th Cir. 1985). Once again, the touchstone is the reasonableness of the police conduct under the circumstances. Kapperman, 764 F.2d at 790 n.4. Here, Township Defendants believed that the occupants of the vehicle in question may be connected to the shooting of a police officer. The officers needed to keep Plaintiffs at the scene long enough for their identifications to be checked and for Det. Scully and Det. Leskowski to arrive to see if Plaintiffs were familiar to them. Their concern for their safety during the detention was reasonable given their belief that Plaintiffs could be dangerous. Therefore, it was not a violation of Plaintiffs' rights for the officers to use handcuffs during the course of the stop.

### (e)   Duration of the Stops

The duration of a stop can, in the totality of the circumstances, be too long to be justified as an investigatory stop. See United States v. Sharpe, 470 U.S. 675, 686 (1985). In determining "whether a detention is too long in duration to be justified as an investigative stop, we . . . examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it

was necessary to detain" an individual.  Id. (finding that a twenty-minute detention did not violate the defendant's Fourth Amendment rights).  The Supreme Court has cautioned that judges "should not indulge in unrealistic second-guessing."  Id.  While a judge may be able to imagine an alternative means of accomplishing the ends of the stop that would have been less intrusive, this does not render the officers' actions unreasonable.  Id. at 686-87. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."  Id. at 687.

The exact durations of the stops in this case are disputed by the parties.  Viewing the record in the light most favorable to Plaintiffs, the Canales/Valcourt stop lasted thirty-five to forty minutes according to Canales.  (Canales Dep. at 30.)  Valcourt estimated twenty-five to thirty minutes (Valcourt Dep. at 32), but for the purposes of the analysis the Court will accept Canales's version of the events.  Williams testified that he was stopped by the police for approximately twenty minutes.  (Williams Dep. at 33.)  During this time, officers were attempting to identify the men, ensure the safety of the situation, and await the arrival of Det. Scully and Det. Leskowski to determine whether they recognized the men.  Det. Scully and Det. Leskowski were driving to multiple stops at multiple locations in their efforts to identify the

61

suspect.  They had special knowledge and experience about gang members in the area, so their presence was important to the operation.  Moreover, these stops were in the midst of a multi-jurisdictional manhunt for the shooter of another police officer. The Court is mindful of the difficulty in orchestrating an operation of that size and finds that the officers were diligent in accomplishing the purposes of the stops.  Whether the stops could have been completed more quickly is not the inquiry.  The Court concludes that the officers acted reasonably in terms of the length of the detention, and Plaintiffs' rights were not violated by the duration of the stops.

### iii. Pat Downs/Searches

Plaintiffs all allege that their persons were searched in some manner by the officers.  Canales and Valcourt allege that the officers went through their pockets to obtain their identification. (Valcourt Dep. at 29; Canales Dep. at 25.)  Canales identified the officer who took his wallet as the same plain-clothes officer who had forcibly removed him from the car.  (Canales Dep. at 25.) Valcourt simply testified that "somebody" went into his pockets. (Valcourt Dep. at 29.)  Sgt. Kenny testified that their identifications were obtained by the plain-clothes officers, but he did not elaborate on how they were obtained.  (Kenny Dep. at 23.)

Williams also alleges that the officer who pulled him out of the car -- who was McDowell based on Carey's and McDowell's testimony -- searched him.  He does not elaborate on the manner of the search.  (Williams Dep. at 22; see also McDowell Dep. at 12, 14; Carey Dep. at 15.)  The excerpted testimony of Carey and McDowell that is part of the summary judgment record does not address the accusation that they searched Williams.  However, it is apparent from their testimony that McDowell was controlling the stop, and Carey was providing cover, and thus, it is likely that, under Williams's version of the facts, McDowell performed the search in Carey's presence.  (See Carey Dep. at 15.)  The record does not suggest that any other Defendants other than the aforementioned were remotely involved in either of the alleged searches.

The Court must evaluate whether Plaintiffs have stated a constitutional violation with respect these alleged searches and, if so, who, if anyone, can be liable.  In the course of an investigative stop, like the ones at issue here, an officer may constitutionally conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."  Terry, 392 U.S. at 27.  In circumstances

in which police have detained a suspect whom they were told was armed and dangerous by other officers, courts have upheld the limited search for weapons.  See, e.g., Robertson, 305 F.3d at 170; Stokes v. O'Connor, Nos. 93-16, 93-208, 1994 WL 829066, at *10 (D. Del. June 30, 1994) (where plaintiff was stopped during manhunt for armed felon, police were justified in conducting a pat-down search of plaintiff for weapons while they waited for other officials to identify him).

However, "when a protective search goes beyond a search for weapons and becomes a search for evidence, it is no longer valid under Terry."  Baker, 50 F.3d at 1194 (citing Minnesota v. Dickerson, 508 U.S. 366 (1993)).  Where police have searched through a detainee's wallet and pocketbook, the Third Circuit has determined this to be a "full-scale search[] for evidence, having nothing to do with a limited Terry-frisk, and having no probable cause justification."  Id.

For the same reasons that officers in this case were permitted to handcuff Plaintiffs and point guns at them, the officers at the stops in question would have been justified in patting down Plaintiffs to determine if they were armed.  However, the facts viewed in the light most favorable to Plaintiffs suggest that these searches may have gone beyond a limited Terry-frisk and were not simply a search for weapons.

As in Baker, the officers in this case removed Canales's and Valcourt's wallets from their pockets.  Sgt. Kenny's testimony suggests that after the individuals were handcuffed, he obtained the drivers licenses from the plain-clothes officers.  (See Kenny Dep. at 22-23.)  If Canales and Valcourt were handcuffed, it would have been difficult for them to obtain their own identifications to give to the police.  Rather, the officers would have had to retrieve the identifications themselves.  Therefore, the Court finds that, the facts viewed in the light most favorable to Plaintiffs Canales and Valcourt indicate that the search of their persons exceeded the permissible bounds of the Fourth Amendment.

The Court must determine who, if anyone, can be held responsible for this violation.  The record reflects that the plain-clothes officers performed the illegal search, while Jacques and Sgt. Kenny were present.  The plain-clothes officers are not named defendants in this action.  None of the individual defendants in this case were responsible for the unconstitutional searches, and thus, they are entitled to qualified immunity.

With respect to Williams, he alleges that after the officers removed him from the car, the officer (likely McDowell based on McDowell's testimony) "told me to spread my legs and he searched me at that time."  (Williams Dep. at 22.)  The excerpts of Defendants' testimony are silent as to whether Williams was searched and in

65

what manner.  The Court finds that Williams's testimony alone is insufficient to demonstrate that this search occurred or that it exceeded the permissible bounds of Terry.  Moreover, Williams's statement does not disclose the nature of the search.  His statement that he was searched is consistent with both a search that complies with Terry -- a mere pat down of his clothing for weapons -- as well as a more intrusive search that exceeds the bounds of Terry.  In response to Township Defendants' submissions showing a lack of evidence on this claim, Williams bore the burden of coming forward with factual references supporting his claim for relief.  See Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 586-87; Williams, 891 F.2d at 460-61.  Williams had the opportunity to elaborate on the nature of the search during his deposition.  Carey and McDowell -- the officers who effectuated the stop of Williams -- were also deposed, and Williams could have questioned them about the alleged search and provided the Court with excerpts from those depositions.  In spite of these opportunities, Williams failed to provide evidence that would support a Fourth Amendment violation based on the search of Williams's person, other than his bare allegation.

For these reasons, summary judgment is granted in favor of Defendants as to the alleged searches of the Plaintiffs' persons.

### iv.  Car Search

The Court must also evaluate whether the alleged searches of Plaintiffs' cars violated the Fourth Amendment.  In Michigan v. Long, 463 U.S. 1032 (1983), the Supreme Court held that, as an extension of Terry, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief . . . that the suspect is dangerous and the suspect may gain immediate control of weapons" when he re-enters the vehicle.  Id. at 1049-50 (quoting Terry, 392 U.S. at 21).  However, the rationale of Long does not extend to protective searches in trunks.  See Valance v. Wisel, 110 F.3d 1269, 1277-78 (7th Cir. 1997).

Valcourt testified that during the stop, the individuals wearing tactical gear "proceeded to strip search the vehicle . . . [l]ike open all the doors, the trunk, going under seats, glove compartments."  (Valcourt Dep. at 30.)  Sgt. Kenny and Jacques did not know at the time of their depositions whether the car was searched or whether the plain-clothes officers searched the vehicle.  (Jacques Dep. at 23; Kenny Dep. at 23-24.)  Sgt. Kenny testified that he performed a "cursory search from outside" the vehicle to see if there were any other persons or weapons in plain view.  (Kenny Dep. at 23.)  Williams also testified that the two

officers who initiated his stop -- likely Carey and McDowell based on their testimony -- "proceeded to go through my entire vehicle." (Williams Dep. at 23.)  He elaborated, "They pulled everything out of the dashboard, they pulled everything out of the backseat, anything I had in a bag. . . . They went through my entire car." (Id. at 23-24.)

   With respect to Williams, once again, the Court finds that the evidence is insufficient to support a violation of the Fourth Amendment.  First, Williams does not specifically state that his trunk was searched.  His testimony suggests that the officers performed a thorough search of the passenger compartment of the car.  This search was permissible under Long.  Because Carey and McDowell believed they were stopping someone who was involved with the suspect in the officer shooting, they had reason to fear for their safety once Williams returned to the car.  They were permitted to search the passenger compartment of the car for weapons under Long.  Williams did not provide the Court with deposition excerpts of his questioning of McDowell and Carey about this search and whether it extended to the trunk.  His bare allegation is insufficient to support this claim.

   As to the Canales/Valcourt stop, the Court finds that the record, viewed in the light most favorably to Plaintiffs, suggests that the car and its trunk were in fact searched by officers on the

scene.  Valcourt testified that the car was searched by officers in tactical gear, and Sgt. Kenny and Jacques were not certain whether the plain-clothes officers performed any search.  While the search of the passenger compartment of the vehicle was proper under Long, the search of the trunk as alleged by Valcourt exceeds the scope of Long.  The facts viewed in the light most favorable to Canales suggests that his Fourth Amendment rights were violated as to the search of the trunk.[6]

Despite the Court's finding that Canales's rights were potentially violated, once again, there is insufficient evidence in the record to suggest that any of the named defendants are the perpetrators.  Valcourt testified that the officers who searched the car were in tactical gear, and he testified that Sgt. Kenny was in plain clothes.  (Valcourt Dep. at 21, 30.)  Sgt. Kenny and Jacques testified that they were both wearing tactical gear and that they did not search the car and did not know whether the plain-clothes officers did.  (Jacques Dep. at 8, 23; Kenny Dep. at 10-12, 23-24.)  To hold Sgt. Kenny and Jacques responsible based on Valcourt's testimony would allow Valcourt to contradict himself; he stated that Sgt. Kenny was in plain clothes but that it was the

---

[6] The car belonged to Canales, and thus, his rights, and not Valcourt's, would have been violated if the trunk were in fact searched.  See Rakas v. Illinois, 439 U.S. 128, 148 (1978) (search of vehicle did not violate rights of passengers who were in vehicle with the consent of the owner of the vehicle).

officers in tactical gear who searched his car.  Viewing these facts in the light most favorable to Canales, a jury could not find by a preponderance of the evidence that Sgt. Kenny and Jacques were the individuals who searched his car.  As a result, Township Defendants are entitled to qualified immunity, and the Court will grant summary judgment with respect to the alleged automobile searches.

### v.   Excessive Force

The Court must next consider whether the manner in which the stops were effectuated violated Plaintiffs' constitutional rights – – that is, whether the officers used excessive force during the detention.

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable."  <u>Kopec</u>, 361 F.3d at 776 (quotation omitted).  "The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'"  <u>Id.</u> (quoting <u>Graham</u>, 490 U.S. at 397).

While reasonableness for Fourth Amendment purposes is typically a question for the jury, an officer can prevail on a

summary judgment motion if the court concludes that the use of force, under the circumstances, was objectively reasonable.  Id. at 777; see also Abraham v. Raso, 183 F.3d 279, 290 (3d Cir. 1999) ("[S]ince we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared.")  In evaluating the reasonableness of the officer's conduct for excessive force claims, a variety of factors are relevant, including:

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, [] whether he actively is resisting arrest or attempting to evade arrest by flight[,] . . . the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

Kopec, 361 F.3d at 776-77.  Moreover, courts are cautioned to judge reasonableness from the perspective of the officer on the scene, who may be required to make split-second judgments.  Graham, 490 U.S. at 396-97.  If after conducting this analysis, a court concludes that "the use of force is objectively unreasonable, officers are not entitled to qualified immunity."  Christian v. Orr, 512 Fed.Appx. 242, 246 (3d Cir. 2013).

In Kopec v. Tate, 361 F.3d 772 (3d Cir. 2004), the plaintiff alleged that the officer put handcuffs on him that were overly tight and that the officer failed to respond for about ten minutes to the plaintiff's requests for the handcuffs to be loosened.  Id. at 777.  Noting that the circumstances were "benign" and that the officer was not tending to other people or matters at the time of the requests, the court concluded that these facts, if credited, would establish an excessive force claim.  Id.  In denying the officer qualified immunity, the court stated that an arrestee's right "to be free from the use of excessive force in the course of his handcuffing clearly was established [in 2000 when the officer] acted in this case, and that a reasonable officer would have known that employing excessive force in the course of handcuffing would violate the Fourth Amendment."  Id. at 778.

The focus of the excessive force analysis here is on the force allegedly used against Canales when he was removed from the car and handcuffed.  While Valcourt and Williams also assert that they endured excessive force, the record does not support these claims following ample discovery.

The Complaint alleges force against Valcourt because he was "forcibly thrust . . . into the snow filled ground and then asked . . . to get on his knees," and then was lifted by his handcuffs. (See Am. Compl. at ¶ 22.)  Yet none of Defendants testified that

Valcourt was thrust onto the snow-covered ground, and notably, Valcourt's testimony at his deposition did not suggest undue force. He stated, "Then my door opens and I get pulled out of the car and I get put on the ground and handcuffed," but this does not indicate a violent thrust onto the snowy ground.  (Valcourt Dep. at 24.) Valcourt did not testify that he was lifted up by his handcuffs. (Id. at 24-26.)  Similarly, while Williams testified that the officers removed him from the car with "more than enough force" (Williams Dep. at 22-23), there is no evidence that the officers used excessive force against him other than his bare assertion. Williams does not elaborate on what he meant by this.  Moreover, McDowell testified that he simply asked Williams to exit the car. (McDowell Dep. at 14.)  Williams's allegation of "more than enough force" is inadequate at this stage in the proceedings to support an excessive force claim.

With respect to Canales, however, the Court finds that there is a genuine issue of material fact as to whether Canales was subjected to excessive force during the stop.  Canales and Valcourt testified that, without identifying himself, the plain-clothes officer pulled Canales out of the car and "slammed" him to the ground.  (Canales Dep. at 20-21, 29-30; Valcourt Dep. at 20-22.) Valcourt believed that the plain-clothes officer was Sgt. Kenny. (Valcourt Dep. at 21.)  Canales also testified that the plain-

73

clothes officer said "Don't [f***ing] move or I'll blow your head off." (Canales Dep. at 20.) The plain-clothes officer handcuffed him and left him on the ground for eleven minutes. (Id. at 22, 28.) Canales testified that when the plain-clothes officer allowed him to get up from the ground, rather than directing him to get up, the officer lifted him off the ground by his handcuffs and slammed him onto the hood of the police car. (Id. at 23-24, 28.) Canales explained that this act of lifting him up while his hands were cuffed behind him injured his shoulder, and this injury has interfered with his ability to perform daily activities. (Id. at 31, 40-43.)

Sgt. Kenny, in contrast, denied that Canales was slammed on the ground, and he did not remember Canales being lifted by his handcuffs. (Kenny Dep. at 20.) He testified that based on where he was standing, he could not see the passenger side of the vehicle very well, which implies that he could see the driver side of the vehicle. (Id. at 20-21.) He also explained that his attention was called in several directions, including monitoring traffic, keeping the scene safe, and seeing if the other officers needed assistance. (Id. at 21.) Jacques, on the other hand, testified that he could not see if the driver (Canales) was pulled out of the car because he was watching the passenger. (Jacques Dep. at 16.)

74

While more force may be justified for a non-compliant detainee, the record, viewed in the light most favorable to Plaintiffs, indicates that Canales was, in fact, cooperative. Jacques and Sgt. Kenny gave inconsistent testimony regarding Canales's demeanor when the stop was initiated.  Jacques testified that Canales and Valcourt were cooperative, but Sgt. Kenny testified that Canales was not compliant and was agitated and defiant.  (Id. at 11; Kenny Dep. at 14.)  The Court accepts Jacques' testimony for the purposes of this motion, as it is more favorable to Plaintiffs.

Viewing these facts in the light most favorable to Plaintiffs, a jury could find that Canales was cooperative during the stop, but nonetheless was ripped from his car and slammed to the ground by the plain-clothes officer.  A jury could find that he was handcuffed, and then lifted up by his handcuffs, thereby permanently injuring his shoulder.  Considering the factors articulated by the Third Circuit in Kopec, while the plain-clothes officer here would have believed that Canales was a suspect in an investigation of a severe crime (shooting of a police officer) and that Canales was armed and dangerous, Canales was not actively resisting his removal from the vehicle or the use of the handcuffs. See Kopec, 361 F.3d at 776-77.  Moreover, there were several officers on the scene, so the plain-clothes officer was not dealing

75

with several people all at once.  See id. at 777.  Notably, the most painful use of force, the lifting of Canales up by his handcuffs, was used after Canales was handcuffed and secured.  The Court finds that an issue of fact exists as to whether Canales's right to be free from the use of excessive force was violated in the course of his handcuffing and the lifting of Canales after he was handcuffed.  The right to be free from excessive force in the course of handcuffing was clearly established on the night in question.  See id. at 778 (right to be free from excessive force in course of handcuffing clearly established by 2000).

Sgt. Kenny and Jacques defend the claims against them by arguing that they are not the individuals who had physical contact with Canales, but rather it was the unknown plain-clothes officers. The Court rejects this argument for two reasons.  First, Valcourt testified that Sgt. Kenny was the plain-clothes officer, and the Court must view the facts in the light most favorable to Plaintiffs.  Thus, Sgt. Kenny may have directly inflicted the injury.  And second, an officer may be directly liable under section 1983 where he fails to intervene when a constitutional violation by another officer takes place in his presence.  Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002).  This potential liability for failing to intervene does not depend on the ranks of the officers in question; the duty to intervene applies whether it

76

is a superior officer, a lower ranked officer, or an officer of the same rank.  Id. at 651.  "However, an officer is only liable if there is a realistic and reasonable opportunity to intervene."  Id. The Third Circuit has determined that this duty to intervene was clearly established by 1995.  Garbacik v. Janson, 111 Fed.Appx. 91, 94 (3d Cir. 2004) ("[W]e clarified in 1995 that liability will lie if an officer 'had knowledge of and acquiesced in' a § 1983 violation."  (quoting Baker, 50 F.3d at 1190-91)).

Sgt. Kenny and Jacques were present when Canales was subjected to the arguably unconstitutional conduct.  "If so, each defendant may have had actual knowledge of the treatment of [the] plaintiff by the other officers."  See Christian, 512 Fed.Appx. at 245.  The Court finds no evidence that Sgt. Kenny and Jacques attempted to intervene in the treatment of Canales, which "does not rule out possible acquiescence."  See id.  Thus, there is a dispute of material fact as to who inflicted the excessive force, whether Sgt. Kenny and/or Jacques had knowledge of the excessive use of force by the plain-clothes officer, and whether they had a "realistic and reasonable opportunity to intervene."  See Smith, 293 F.3d at 651. Therefore, Sgt. Kenny and Jacques are not entitled to qualified immunity on the claim of excessive force.

For these reasons, the Court will deny summary judgment on the excessive force claim of Plaintiff Canales as to Defendants Sgt.

Kenny and Jacques.  As there is no evidence of excessive force by any other defendants, the Court will grant summary judgment as to all the other individual defendants.

### e.   Equal Protection Claims

Plaintiffs also allege that Township Defendants violated their right to "equal protection of the law."  (Am. Compl. at ¶ 34.)  The basis of this claim appears to be that they were racially profiled. They have argued that the only thing they had in common with the suspect was their race –– African American.  (Pls.' Br. in Opp'n Mot. for Summ. J. at 7.)

"To make an equal protection claim in the profiling context, [the plaintiff is] required to prove that the actions of [law enforcement] (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose." Bradley v. United States, 299 F.3d 197, 205-06 (3d Cir. 2002).  Proof of discriminatory effect requires proof that the plaintiff is a member of a protected class and that he "was treated differently from similarly situated individuals in an unprotected class." Id. at 206.  In some cases, discriminatory effect may be shown by "submitting statistical evidence of bias." Id.

The record cannot support Plaintiffs' equal protection claim on the basis of racial profiling.  While it undisputed that Plaintiffs, as African Americans, are members of a protected class,

see id., there is no evidence that they were treated any differently than similarly situated members of an unprotected class.  There is absolutely no evidence that had the suspect been a white male, the police would have continued to stop African American men leaving the vicinity of the Hotel instead of stopping white men.  See Alvin v. Calabrese, 455 Fed.Appx. 171, 177-78 (3d Cir. 2011).  Moreover, Plaintiffs have not submitted any statistical evidence that could support their claim.  Therefore, the Court will grant summary judgment on the equal protection claim.

### 2.    Claims Against the Municipality

Plaintiffs have asserted various claims against Toms River in this matter based on -- inter alia -- failure to exercise due care; failure to properly train, discipline, restrain, and control employees; and failure to take adequate precautions in the hiring and retention of employees.  (See, e.g., Am. Compl. at ¶¶ 41, 45-47.)  They allege that this demonstrates "a policy of condoning misconduct" and that, "[g]iven the incident of January 14, 2011 involving Officer Christopher Matlosz and the reaction to same by police officers, special training, supervision and control should have been employed to prevent African Americans from being subjected to inappropriate arrests and searches."  (Id. at ¶¶ 45-46.)

Following discovery, Plaintiffs cannot, beyond mere conclusory allegations, establish an official policy, a custom or practice, or a failure of decision makers to adequately train employees.  See City of Canton, 489 U.S. at 387; Monell, 436 U.S. at 694.  Nor have Plaintiffs come forward with evidence of a pattern of violations. Berg, 219 F.3d at 276.  In fact, the record suggests that the events of January 15, 2011 were anything but customary for Toms River.  Numerous law enforcement agencies attempted to coordinate a massive manhunt for a suspect who had shot another police officer. Viewing the record in the light most favorable to Plaintiffs, despite Defendants' efforts at organization, there was some disorder and confusion.  Yet Plaintiffs cannot show that this was the result of any policy, custom, or failure to train on the part of Toms River as opposed to the chaotic circumstances of the day.

At this stage in the litigation, Plaintiffs have not met their burden, in response to Township Defendants' submissions, of demonstrating the presence of at least one disputed issue of fact to support their Monell claims.  See Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 586–87; Williams, 891 F.2d at 460–61.  The Court will grant summary judgment on these claims.

### 3.   Conspiracy Claim Under 42 U.S.C. § 1985(3)

Plaintiffs have also asserted a claim for conspiracy under 42 U.S.C. § 1985(3) against Defendants Sgt. Kenny and Jacques, as well

as the unnamed State Police officers, based on the alleged

excessive use of force against them, most notably against Plaintiff

Canales.

> Section 1985(3) provides in pertinent part:
>
> If two or more persons in any State or Territory
> conspire . . . , for the purpose of depriving, either
> directly or indirectly, any person or class of persons
> of the equal protection of the laws, or of equal
> privileges and immunities under the laws; . . . the
> party so injured or deprived may have an action for
> the recovery of damages occasioned by such injury or
> deprivation, against any one or more of the
> conspirators.

An essential element under section 1985(3) is the existence of

a conspiracy.  See Farber v. City of Paterson, 440 F.3d 131,

134 (3d Cir. 2006) (citing United Bhd. of Carpenters & Joiners

v. Scott, 463 U.S. 825, 828-29 (1983)).  "To survive a motion

for summary judgment on [a] section 1985(3) claim, [the

plaintiff is] required to put forward facts that would allow a

reasonable factfinder to conclude that [the defendants] formed

a conspiracy to deprive him of his rights."  Estate of Oliva

ex rel. McHugh v. New Jersey, 604 F.3d 788, 802 (3d Cir.

2010).  "[D]irect evidence of conspiracy is rarely available

and . . . the existence of a conspiracy must usually be

inferred from the circumstances."  Maxberry v. Sallie Mae

Educ. Loans, 532 Fed.Appx. 73, 76 (3d Cir. 2013) (quoting

Capogrosso v. Supreme Ct. of N.J., 588 F.3d 180, 184 (3d Cir.

2009)), cert. denied, No. 13-7339, 2014 WL 210696 (U.S. Jan. 21, 2014).  Nonetheless, there must be "some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action."  Id. (quoting Capogrosso, 588 F.3d at 185).

The record is devoid of any evidence of direct or circumstantial evidence of any conspiracy on the part of Sgt. Kenny, Jacques and the plain-clothes officers.  See Livingston v. Borough of Edgewood, 430 Fed.Appx. 172, 178-79 (3d Cir. 2011) (affirming lower court's dismissal of conspiracy claims where there was "insufficient evidence in the record to establish the requisite 'meeting of the minds,' and therefore, the existence of a conspiracy," since the plaintiff failed to proffer direct or circumstantial evidence "sufficient to a reasonable finding of conspiratorial agreement or concerted efforts" by the defendants).  Therefore, the Court will grant summary judgment to Defendants on the conspiracy claim.

### 4.  State Law Claims

Plaintiffs have also asserted various state law claims.  The claims against Toms River, include: negligence under a theory of respondeat superior; negligence under theories of failure to train, supervise, discipline, and control the individual defendants; negligent hiring, retention, and deployment of dangerous employees;

malicious prosecution; and false arrest.  (Am. Compl. at ¶¶ 53-67.)
Plaintiffs assert claims for false arrest and malicious prosecution
against all the remaining individual defendants and additionally
allege intentional and negligent assault against Sgt. Kenny and
Jacques.  (Id. at ¶¶ 48-52, 68-72.)

These claims against Toms River and its employees are subject
to the limitations of the New Jersey Tort Claims Act (hereinafter
"Act"), N.J.S.A. 59:1-1 et seq.  See N.J.S.A. 59:1-2.  That Act
provides, in part, that "[n]o action shall be brought against a
public entity or public employee . . . unless the claim upon which
it is based shall have been presented in accordance with the
procedure set forth in this chapter."  N.J.S.A. 59:8-3.  The Act
requires that, prior to filing a complaint in court, a prospective
plaintiff file a claim with either the Attorney General or the
department/agency responsible for the injury that details the
circumstances and the nature of the injury caused by the public
entity or its employees.  N.J.S.A. 59:8-4 to 59:8-7.  This notice
of claim "shall be presented as provided in this chapter not later
than the 90th day after accrual of the cause of action."  N.J.S.A.
59:8-8.  The accrual date is generally the date on which the
alleged tort was committed.  Beauchamp v. Amedio, 164 N.J. 111, 117
(2000).

The filing of a timely notice of claim as a precondition to filing a lawsuit is a jurisdictional requirement.  See Madej v. Doe, 194 N.J. Super. 580, 588-89 (Super. Ct. 1984).  The requirement applies to claims based on negligence as well as intentional torts.  Velez v. City of Jersey City, 180 N.J. 284, 294-95 (2004).  The legislative goals underlying the notice requirement are:

> (1)  to allow the public entity at least six months for administrative review with the opportunity to settle meritorious claims prior to the bringing of suit; (2) to provide the public entity with prompt notification of a claim in order to adequately investigate the facts and prepare a defense; (3) to afford the public entity a chance to correct the conditions or practices which gave rise to the claim; and (4) inform the State in advance as to the indebtedness or liability that it may be expected to meet.

Beauchamp, 164 N.J. at 121-22 (internal quotation marks and citations omitted).  In order to serve these goals, the Act only allows the claimant to file suit "[a]fter the expiration of six months from the date notice of claim is received."  N.J.S.A. 59:8-8.

The record here suggests that Plaintiffs did not satisfy the procedural requirements of the Act.  (See Twp. Defs.' Answer, Cross-Claims, & Counterclaim, at Affirmative Defenses ¶¶ 12-13.) Plaintiffs' claims accrued on January 15, 2011, the date of the underlying conduct, and thus, such notices of claims should have been and were filed by mid-April 2011.  The notice of claims were

filed by Plaintiffs with the Township of Toms River and the Toms River Police Department as follows: by Canales on January 31, 2011; by Valcourt on February 28, 2011; and by Williams on March 22, 2011. (See dkt. entry no. 22, Pls.' Br. in Opp'n to Ocean Cnty. Prosecutor's Office Mot. to Dismiss, Ex. A, Notices of Claims.) However, Plaintiffs did not wait the requisite six months before initiating a suit in this Court. They initiated the suit on June 1, 2011, just over two months after the last plaintiff, Williams, filed his notice of claim and only four months after the first plaintiff, Canales, filed his notice of claim. (See dkt. entry no. 1.) Thus, the procedure dictated by the Act was not followed, and Defendants' Motion for Summary Judgment will be granted as to Plaintiffs' state law claims.[7]

### VI.   CONCLUSION

For the reasons stated, and for good cause showing, the Court will (1) grant the State Police's Motion for Summary Judgment in its entirety as to all direct claims and cross-claims; (2) deny the Township Defendants' Motion for Summary Judgment without prejudice with respect to the excessive force claims by Plaintiff Canales against Sgt. Kenny and Jacques under section 1983; (3) grant the

---

[7] This grant of summary judgment is without prejudice. If Plaintiffs are able to demonstrate compliance with the Act to the Court, the Court is amenable to reconsidering this grant. However, the Court cautions that if the parties revisit this issue, the parties must adequately brief the issues relating to these state law claims.

Township Defendants' Motion for Summary Judgment without prejudice on the state law claims; and (4) grant the remainder of the Township Defendants' Motion for Summary Judgment.  The Court will issue an appropriate order and judgment.

                              s/ Mary L. Cooper
                         **MARY L. COOPER**
                         United States District Judge


Dated: February 20, 2014

86